**AMERICAN FLETCHER MORTGAGE COMPANY, INC., Plaintiff,**

v.

**FIRST AMERICAN INVESTMENT CORPORATION and Fidelity Capital Corporation, Defendants.**

**Civ. A. No. C75–1750A.**

United States District Court, N. D. Georgia, Atlanta Division.

June 30, 1978.

---

188

Stuart E. Eizenstat and Robert L. Connally, Jr., Powell, Goldstein, Fraser & Murphy, Atlanta, Ga., for plaintiff.

Emmett J. Bondurant and Albert C. Ruehmann, III, Kilpatrick, Cody, Rogers, McClatchey & Regenstein, Atlanta, Ga., for defendants.

## ORDER

MOYE, District Judge.

This diversity suit is brought by American Fletcher Mortgage Company (American Fletcher), an Indiana corporation which is seeking damages resulting from alleged breaches of ·contracts entered into for the acquisition, development, construction, and financing of The Woods Condominiums (Woods) in east Cobb County, Georgia. Plaintiff American Fletcher claims that it is entitled to collect damages from the defendant Georgia corporations, First American Investment Corporation (First American) and Fidelity Capital Corporation (Fidelity), on two grounds. First, American Fletcher contends that it is a third-party beneficiary of a contract between Futren of Powers Ferry, Inc. (Futren), a Georgia corporation which was the owner and developer of the Woods, and the defendants which the defendants allegedly breached. Secondly, American Fletcher contends that it had a contract with the defendants for the construction and financing of the Woods which the defendants allegedly breached.

This action is being tried by the Court on deposition testimony, documents, and briefs submitted by the parties pursuant to an agreement reached between counsel for the parties, as approved by this Court. On the basis of the evidence presented, the Court makes the following:

### Findings of Fact

In September 1972, James L. Rhoden, Jr., the president and principal shareholder of Futren, began seeking financing for the acquisition, development, and construction of the Woods. Three lenders, in particular, expressed an interest in financing the Woods condominium project. They were plaintiff American Fletcher, with whom Rhoden had previously never done any business, and defendants First American and Fidelity, both of whom were involved in the financing of another condominium project that Futren was developing in St. Petersburg, Florida. Rhoden's contacts with American Fletcher were almost exclusively with one of its vice-presidents, James P. Trepinski, while Rhoden's contacts with the defendants First American and Fidelity were primarily with William B. Hargett, an assistant-vice president of First American, who was acting on behalf of both defend-

ants with respect to their possible financing participation in the Woods.[1]

As discussions between Rhoden and the three prospective lenders progressed during the fall of 1972, plaintiff American Fletcher indicated that it would be amenable to providing one hundred percent of the financing for the acquisition, development, and construction of the Woods, provided that Rhoden obtain additional financial backing. Defendants First American and Fidelity, on the other hand, expressed an interest in providing a more limited type of financing for the Woods. The defendants indicated that they were willing to provide Futren with "standby," or secondary, financing for the Woods provided that Rhoden obtain the primary construction financing for the condominium project from another lender.

On December 6, 1972, American Fletcher issued two loan commitment letters to Rhoden, one for a $2,250,000 land acquisition and development loan, and the other for a $2,150,000 construction loan for the Woods. Both of these commitment letters contained a condition that the borrower be a corporate nominee acceptable to American Fletcher. This condition was designed to insure that Rhoden obtain some form of additional financing and that the borrower have more financial substance than simply the collateral (i. e., land and improvements thereon) securing American Fletcher's loans.

On December 13, 1972, Rhoden obtained additional financial backing in the form of a standby loan commitment from First American and Fidelity, evidenced by a loan commitment letter signed by Jerry J. Pezzella, Jr., president of First American, and Wayne J. Haskins, vice-president of Fidelity. The loan commitment to Rhoden, which was later assigned to Futren, provided that the defendants agreed to lend Rhoden $500,000 for the construction and development of the Woods, subject to certain terms and conditions, in the event that the loans

made by American Fletcher were depleted prior to the completion of the project. Pursuant to the loan commitment, First American agreed to provide standby financing of $350,000 and Fidelity agreed to provide standby financing of $150,000 for the Woods. These commitments were in exchange for a twenty-five percent share of the equity of the Woods for the defendants and the payment of commitment fees to the defendants amounting to two percent of their respective loan commitments.

On December 14, 1972, Rhoden, Mark Levitt, Rhoden's attorney, and Hargett of First American traveled to American Fletcher's offices in Indianapolis, Indiana, to establish agreement on the particulars of the financing of the Woods. American Fletcher requested and received from the defendants information indicating the financial condition of the defendants at this time. American Fletcher's representatives at the meeting expressed concern regarding the enforceability of the defendants' commitment.

By a letter dated December 18, 1972, Rhoden accepted and, in the process, modified the defendants' commitment letter. He stated that his acceptance of the defendants' commitment was contingent upon American Fletcher's approval of that commitment. He also indicated that American Fletcher wished to be involved in the decision of whether to renew the defendants' commitment which would initially run for only one year.

On December 20, 1972, Rhoden and Hargett again traveled to Indianapolis to meet with American Fletcher's representatives with respect to the financing of the Woods. After the plaintiff's representatives again expressed reservations regarding the open-endedness of the defendants' proposed commitment to Rhoden, Hargett conferred with his home office and presented a letter to Trepinski of American Fletcher which stated that the defendants would prepare a

1. Although Hargett was technically the employee of only First American, a subsidiary of Cousins Properties, Inc., he was authorized to speak for both defendants since the management of Fidelity was entrusted to Cousins Properties, Inc., pursuant to an Investment Advisory Agreement.

letter for American Fletcher at the time of the defendants' loan closing with Rhoden which would acknowledge satisfaction of the conditions contained in the defendants' December 13 commitment letter. The letter also stated that the loan commitment of the defendants would be available to Rhoden pursuant to the conditions contained in certain paragraphs of the loan commitment letter. In addition, the last sentence of the letter stated:

> Should cost over-runs become evident or other conditions which make American Fletcher's mortgage position insecure, our funds will be available upon your request.

On December 27, 1972, American Fletcher closed its land acquisition and development loan with Futren and executed all of the necessary documents. Also on December 27, 1972, First American and Fidelity closed their loans with Futren. The defendants' standby obligations to Futren were contingent on a number of specific terms, representations, and warranties that were stated in detail in a comprehensive written Loan and Stock Purchase Agreement dated December 27, 1972, and executed by each of the defendants and Futren. See Appendix A.

In addition, Hargett of First American wrote a letter on behalf of the defendants on December 27, 1972, to Trepinski of American Fletcher confirming that Futren and defendants had entered into their loan agreements for standby financing of the Woods. See Appendix B.[2] The purpose of the letter was to "acknowledge satisfaction of those certain conditions contained in our letter of commitment dated December 13, 1972." The letter also reiterated that the defendants' $500,000 commitment would be available pursuant to the conditions contained in certain paragraphs of the loan commitment letter which would remain in force throughout the life of the Woods condominium project.[3]

On April 9, 1973, after Piedmont Engineering and Construction Corporation (Piedmont) had been selected as the general contractor for the Woods, American Fletcher's construction loan to Futren was closed. On this date, Futren, First American, and Fidelity entered into a Subordination Agreement whereby defendants' security interest in the Woods was subordinated to the security interest of American Fletcher, which secured the construction loan.

Construction of the Woods during 1973 and the early part of 1974 seemed to be progressing in accordance with the plans and specifications for the condominium

---

**2.** Hargett's December 27, 1972 letter to Trepinski was essentially the same as his December 20, 1972 letter to Trepinski.

**3.** Two of the conditions that remained in force throughout the duration of the construction of the Woods are:

8. All net proceeds of the Acquisition and Development loan and the Construction loan must be applied to land, direct labor, and materials to be used to construct said improvements and approved indirect costs. All income received on said improvements must be applied to direct and indirect construction and operating costs of the improvements or held in escrow under the terms and conditions to be approved by Licensees to the extent such cash flows are not required to meet said costs. *The improvements on the property must be completed in a good and workmanlike manner and must be paid for in full, all pursuant to the final plans and specifications approved by the construction lender and by Licensees.* Licensees shall be furnished a complete set of development plans and specifications as approved by the construction lender, and any change orders must be approved by us. Licensees shall receive an architect's certification of compliance with said plans and specifications and a certificate of occupancy. (Emphasis added.)

22. *Concern shall not undertake or carry out any development which in the opinion of the Licensees materially injures the environment of the area or creates undue ecological changes, and Licensees shall have no obligation to make further disbursements of loan proceeds while any such condition exists.* If Concern is stopped from development by injunction due to environmental or ecological protest and such objection could not have been reasonably foreseen or prevented by Concern, then Licensees agree to accrue interest and forego quarterly interest payments during the period such work stoppage is in effect, but in no event shall this period exceed the maturity date of the notes. (Emphasis added.)

project. Rhoden and his agents made frequent and complete inspections of the work being done by the general contractor, Piedmont, and its subcontractors to insure that work was being completed properly and on time. In addition, Rhoden kept both the plaintiff and the defendants comprehensively advised of all developments at the Woods. Rhoden maintained an especially close working relationship with Hargett and conferred regularly with him concerning work progress and draw requests.

Throughout the course of the administration of the two loans made by American Fletcher to Futren, the defendants' representatives, including Hargett, reviewed and approved the draw requests submitted by Futren to American Fletcher in order to obtain funds to pay Piedmont for its work. In passing on these draw requests, the defendants placed the following language on the cover sheets of the draws:

> The above signed acknowledges receipt of a complete copy of the attached Draw and further acknowledges our Letter of Commitment dated December 13, 1972 is in full force and effect in accordance with the requirements of our letter to Mr. J. P. Trepinski dated December 20, 1973 (sic).[4] No representation is hereby made as to the correctness of the Draw nor has the above signed made any investigation of the facts stated in the Draw, nor has any inspection of the construction project been made.

This language was contained on every draw request submitted to American Fletcher from approximately July 1973 until December 1974, when the defendants refused to fund their loan commitment.

Despite the apparent progress of the Woods construction, during November and December 1973, defendants entered into discussions with American Fletcher concerning the possibility of American Fletcher purchasing the defendants' equity position in Futren (defendants having obtained twenty-five percent of Futren's common stock by making an initial advance of $100 to Futren on December 27, 1972) and releasing the defendants from their loan commitment. The defendants extended the annual renewal of their commitment from December 15, 1973, to January 5, 1974, to give American Fletcher time to evaluate the proposed restructuring of the financing. Plaintiff American Fletcher refused to purchase the Futren shares and release the defendants because the plaintiff believed that the condominium project was still in the risk stage and because there was no established sales record.

Beginning in 1974, a number of serious development and construction problems became apparent at the Woods. In March 1974, as a result of Piedmont's failure to properly maintain a siltation pond at the Woods, neighboring property was damaged by erosion. During the summer and fall of 1974, of the twenty buildings constructed by Piedmont, buildings 17 and 20 were discovered to be located twelve feet out of place.[5] Massive flitch beam plate and roof truss support variances from contract norms in buildings 10, 13, 16, 18, 19 and 20 and the clubhouse were also discovered. In addition, there were end-wall construction problems, floor slab defects, and foundation problems in some of the buildings, as well as construction delays.

Several other problems also became apparent at the Woods during this period. With respect to environmental problems, trees and shrubbery had been unnecessarily destroyed and not replaced, landscaping and sitework had not been timely completed, and proper siltation pond maintenance had never been established. In addition, Rhoden learned that Piedmont had failed to fully pay its subcontractors for work performed by them at the Woods, thus leaving the project subject to materialmen's liens. Furthermore, the development of the Woods was adversely affected by the facts that Futren had allowed its permanent loan

---

4. This letter was written on December 20, 1972, not December 20, 1973.

5. The first twenty buildings contained approximately 100 condominium units, which was about one-third of the planned total number of 302 units for the project.

commitment of $500,000 that was to be used in the marketing of the condominium units to lapse in November, and that Futren had failed to withhold retainage money as provided in the Futren-Piedmont construction and amenities contracts. In light of all the above problems, Rhoden advised Piedmont that Futren would hold the latter in default, and Rhoden also notified the Safeco Insurance Company of America (Safeco), Piedmont's bonding company, of Piedmont's possible default.

Throughout the latter part of 1974, Rhoden advised plaintiff American Fletcher and defendants First American and Fidelity of the problems that he was experiencing at the Woods. Prior to mid-December 1974, however, neither Hargett nor any other representative of the defendants informed Rhoden that defaults or breaches had occurred under the terms of the Loan and Stock Purchase Agreement, except for the possibility of default in connection with the choice of a realtor to market the individual units at the Woods to whom the defendants objected.

During September and October 1974, however, the defendants discussed with American Fletcher and Futren the possibility of restructuring the financing of the Woods. Specifically, the defendants indicated that they would provide $100,000 in immediate funding for the Woods in exchange for American Fletcher's assumption of the defendants' loan commitment to Futren. Hargett represented the defendants in these negotiations but was not authorized to make any representations regarding what decisions either defendant would make in the future if called upon by Futren to provide financing under the defendants' standby loan agreement.

Hargett stated in a letter to Trepinski of American Fletcher, dated October 1, 1974, that the Venture Capital Group (a group of investment corporations including the defendants) had a portfolio of approximately 120 projects, was approaching a "tight financial position," and wanted to relieve itself of any commitments that were not then funded. Although the letter indicates that the defendants were concerned about possible future funding problems, the Court finds that the statements in the letter do not constitute representations as to what future action the defendants would take if presented with a funding request by Rhoden, since Hargett was not authorized to make such representations. In fact, the defendants were in a sound financial condition during 1974 and could have funded their standby loan obligations to Futren if they wanted to do so.

In November 1974, American Fletcher, First American, Fidelity and Rhoden became extremely concerned about the worsening situation at the Woods. The overall condition of the condominium project was perhaps most aptly described by Rhoden in a letter written on November 22, 1974, to Piedmont, the general contractor, in which Rhoden stated:

. . . We are of the firm position that no independent judge could fail to find that the project as currently constructed presents hazards to life and health and are structurally deficient and substantially fail to comply with plans and specifications.

On November 25, 1974, plaintiff American Fletcher terminated its construction funding of the Woods, and on December 4, 1974, it refused to disburse funds for payment to the general contractor, Piedmont, upon presentation by Rhoden to plaintiff of Draw Request No. 23 for $65,222, which had been signed by Hargett. On December 10, 1974, as demanded by the plaintiff, Futren submitted Draw Request No. 23 to the defendants in order to obtain funds from them pursuant to their standby loan commitment. On this date, the defendants released $10,000 to Futren from Futren's developer's fee Escrow Account which was then used by Futren to pay costs included within Draw Request No. 23.

On December 12, 1974, Rhoden attempted to conditionally renew his loan arrangements with defendants through the hand delivery of letters and two checks in the amounts of $7,000 and $3,000 payable to First American and Fidelity, respectively,

as commitment fees. Each of the checks contained conditional endorsements on its reverse side which stated in pertinent part as follows:

Acceptance of this check constitutes acknowledgement that *funds are now* and *will be available for disbursement under the terms of the Loan and Stock Purchase Agreement* dated December 27, 1972 up to a total amount of . . . .

Payment of this fee and acceptance of same by you shall be relied upon by me as a *complete renewal of your obligation to disburse* . . . pursuant to the above mentioned Agreement. (Emphasis added)

On behalf of the defendants, Hargett refused to accept the letters and check on December 12, 1972, and he advised Rhoden that the checks would not be accepted by the defendants as long as they bore conditional endorsements. On this same date, Hargett orally informed Rhoden that the existence of defaults at the Woods confirmed by the defendants' investigation of the condominium project would be considered by each defendant's respective board of directors in determining whether to fund Futren's Draw Request No. 23. The boards independently decided not to advance funds to Futren nor to renew their loan commitments on December 14, 1974 (within the ten-day time limit for action on draw requests as provided by the Loan and Stock Purchase Agreement). Each defendant then mailed a letter to Futren shortly thereafter setting forth its decision and the reasons therefor. Rhoden personally picked up copies of these letters on or about that date and later received the mailed letters on or about December 23, 1974.

The defendants' standby loan commitments expired on December 15, 1974. As of this date, the outstanding balance on American Fletcher's land acquisition and development loan was $2,198,050 and the balance on the construction loan was $1,620,402.45, for a total of $3,817,452.45. After this date, both Futren and American Fletcher contin-

ued to refuse to reimburse Piedmont for labor and materials supplied by it in constructing the condominium units. On January 8, 1975, Piedmont retaliated by filing a general lien against the Woods for $267,824. On January 9, 1975, American Fletcher modified its land acquisition and development loan to Futren to increase the amount of the loan and the disbursement permitted thereunder each by $500,000.[6] American Fletcher increased the amount of the loan because the plaintiff felt that it was unlikely that other lenders would be willing to loan funds for the Woods, particularly because the security interest in the property obtained by any other lender would be subordinate to the security interests of American Fletcher.

On January 31, 1975, Futren terminated Piedmont, the general contractor, on the grounds that Piedmont had committed numerous material breaches of its construction and site amenities contracts for the Woods. In February 1975, both Futren and Piedmont filed suit against each other in Georgia courts. Futren's action sought damages of over $900,000 to compensate for injury suffered because of Piedmont's delays, defective construction and site work, and failure to pay its subcontractors and materialmen. Futren also alleged that Building Code violations existed at the Woods. Meanwhile, Safeco, Piedmont's bonding company, refused to complete development of the Woods or to bond off Piedmont's general lien. Further delays in the development of the Woods resulted because of Futren's search for another contractor to complete the project.

On March 14, 1975, American Fletcher modified its construction loan to increase gross disbursements by $400,000 in an attempt to enable Futren to continue the development of the Woods. On July 3, 1975, American Fletcher demanded to Safeco that the latter remove all liens filed at the Woods, complete the project according to plans and specifications and take all other actions required by its performance and

---

6. In September 1974, American Fletcher had increased the ceiling on the amount which could be disbursed on its acquisition and development loan by $200,000.

payment bonds. In making this demand, American Fletcher stated that Piedmont's work had been deficient in a number of respects, and the plaintiff also stated that the liens filed on the condominium project were preventing the sale of condominium units and could cause foreclosure under the plaintiff's mortgage.

Safeco did not take the actions demanded by American Fletcher. Subsequently, on October 7, 1975, after giving Rhoden and Futren all required notices, American Fletcher foreclosed on the Woods. The Woods was sold by Futren, acting by and through its duly appointed agent, American Fletcher, to the plaintiff for $3,900,000. An action to confirm this foreclosure sale was timely commenced, and on December 9, 1975, an Order and Judgment of Confirmation and Approval was entered in this matter, confirming the sale. As a result of the foreclosure and subsequent confirmation, American Fletcher sustained a deficiency of $945,546.72. This deficiency is the difference between the sum of the outstanding balances on the plaintiff's loans (which include accrued but unpaid interest) of $4,845,546.72 as of the date of foreclosure and the price paid of $3,900,000 for the Woods. After American Fletcher foreclosed on the Woods, it completed negotiations with Safeco for indemnification from the latter for advancements made by American Fletcher to complete the Woods. Safeco paid American Fletcher $200,000 under the terms of the final agreement between plaintiff and Safeco.

On the basis of the evidence presented, plaintiff American Fletcher contends that both it and Futren fully performed under their various agreements. Plaintiff maintains that the defendants breached their standby loan agreement with Futren, of which American Fletcher was a third-party beneficiary, and also breached their direct contract with the plaintiff, thereby entitling American Fletcher to recover from defendants the damages that it sustained as a result of the breaches. Plaintiff claims that these damages are equal to the additional amount of $498,034.96 that it funded on the land acquisition and development loan after the defendants refused to fund

plus interest added at the legal rate from October 9, 1975, the date of the foreclosure and the date at which the amount of American Fletcher's damages became certain.

Defendants First American and Fidelity contend that they were in full compliance with the Loan and Stock Purchase Agreement when they refused to fund Draw Request No. 23 and also contend that their commitments to make further advancements under that agreement thereafter expired by its own terms on December 15, 1974. Defendants claim that since they have no liability to Futren, they therefore cannot be held liable to American Fletcher under third-party beneficiary theory. In addition, the defendants contend that they had no direct contractual relationship with the plaintiff which they breached. Accordingly, the defendants argue that the plaintiff is not entitled to collect damages from them.

On the basis of the evidence presented, the Court makes the following

### Conclusions of Law

The Court has jurisdiction of this diversity suit under 28 U.S.C. § 1332. The rights of the parties in this action are therefore governed by Georgia law. *Erie Railroad Company v. Tompkins*, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938).

There are two basic issues in this case. The first issue is whether plaintiff American Fletcher has standing to bring this action against defendants First American and Fidelity and recover all of the damages that it seeks. The second issue is even if the plaintiff does have standing, did the defendants breach their loan agreement with Futren and their alleged direct contract with the plaintiff, thus entitling American Fletcher to collect damages allegedly sustained as a result of the breaches by the defendants.

### I. STANDING OF AMERICAN FLETCHER TO BRING SUIT

A. *American Fletcher's Status as a Third-Party Beneficiary*

██ The general rule in Georgia is that the proper parties to bring an action on a

contract are the parties who, in regard to the subject matter of the contract, have given consideration or exchanged mutual promises of performance. An exception to this general rule which is recognized in Georgia is the third-party beneficiary theory. The beneficiary of a contract between other parties is a proper party to maintain an action against the promisor of a contract. Ga.Code § 3–108. A party's status as a third-party beneficiary depends upon the intention of the contracting parties to benefit the third party, and this intention is determined by a construction of the contract as a whole. *Levy v. Empire Insurance Company*, 379 F.2d 860 (5th Cir. 1969); *Whitley v. Bryant*, 198 Ga. 328, 31 S.E.2d 701 (1944); *Carruth v. Aetna Life Insurance Company*, 157 Ga. 608, 122 S.E. 226 (1922).

Plaintiff American Fletcher contends that Rhoden and defendants intended to benefit plaintiff by their Loan and Stock Purchase Agreement. Plaintiff claims that defendants understood that their standby loan commitment to Rhoden was for the purpose of providing Futren with financial resources above and beyond plaintiff's loans in order to protect plaintiff's investment in the Woods in the event that its loans proved to be inadequate to develop and construct the condominium units at the Woods. Plaintiff further contends that the December 20, 1972, and December 27, 1972 letters written by Hargett of First American expressly acknowledge that defendants' funds would be available if plaintiff's investment and security interests in the Woods became endangered.

■ The Court concludes, however, that American Fletcher was merely an incidental beneficiary of the Loan and Stock Purchase Agreement entered into between Futren and the defendants and therefore does not have standing to sue for the defendants' alleged breaches of this contract. The contract between the defendants and Futren stated that the defendants' standby loan obligations ran solely to Futren, and no provision in the agreement provided for the payment of any funds to American Fletch-

er. Draw requests for funding of the Woods construction were to be submitted only by Futren, and any loans made by the defendants pursuant to these draw requests were to be paid solely to Futren. There were several express references to American Fletcher in the Loan and Stock Purchase Agreement, but these references were simply indications of defendants' recognition of Futren's obligations under its agreement with American Fletcher as the primary lender and holder of a first security deed on the Woods.

■ Although the plaintiff derived some benefit from the existence of defendants' standby loan obligations to Futren, this benefit is not sufficient to confer upon plaintiff the status of an *intended* third-party beneficiary entitled to sue for the alleged breach of the contract. While Georgia Code § 3–108 does not explicitly require that a third-party beneficiary be an intended beneficiary rather than an incidental beneficiary in order to maintain an action on a contract, the Georgia Supreme Court has stated that:

"In order for a third party to have standing to enforce a contract under Code Ann. § 3–108 it must *clearly appear* from the contract that it was intended for his benefit. *The mere fact that he would benefit from performance of the agreement is not alone sufficient.*" (Emphasis added). *Backus v. Chilivis*, 236 Ga. 500, 502, 224 S.E.2d 370, 372 (1976). *See Stewart v. Gainesville Glass Company, Inc.*, 131 Ga.App. 747, 206 S.E.2d 857, aff'd, 233 Ga. 578, 212 S.E.2d 377 (1974).

Thus, under Georgia law a third-party beneficiary can bring an action on a contract between other parties only if the promisor engages to the promisee to render some performance to a third person and both parties to the contract intend that the third person should be the beneficiary. The plaintiff contends that the letters written by Hargett in December 1972 to Trepinski of American Fletcher provide evidence that the defendants agreed to render performance to plaintiff in the form of financing for the Woods, but the Court rejects this contention for the reasons discussed below.

**196**

### B. *American Fletcher's Alleged Direct Contractual Relationship with the Defendants*

■ In addition to claiming status as a third-party beneficiary to the contract between Futren and the defendants, plaintiff American Fletcher contends that it had a contract with the defendants pursuant to which the latter parties agreed to loan Futren $500,000 to secure and protect American Fletcher's investment in the Woods in the event that economic conditions deteriorated to such an extent that plaintiff's security interests in the Woods were jeopardized. Plaintiff contends that this contractual relationship was memorialized and affirmed in the letters written by Hargett on December 20 and December 27, 1972, to Trepinski, and it specifically relies on the following sentence which appeared in both letters as evidence of the defendants' commitment to the plaintiff:

> Should cost over-runs become evident or other conditions which make American Fletcher's mortgage position insecure, our funds will be available upon request.

Yet when the above sentence is read in the context of each of the entire letters, it is apparent that the letters do not constitute unconditional promises by the defendants to provide funds for the Woods. Rather, as stated in the very first sentence of each of the letters, the purpose of the letters was to give notice to American Fletcher of the closing of the loan agreements between the defendants and Futren. In addition, both of the letters stated that the defendants' funds would be available upon satisfaction of certain conditions in the defendants' loan commitment letter of December 13, 1972. See Appendix B.

Moreover, the Hargett letters lack several other elements of a contract under Georgia law. Ga.Code Ann. § 20–107. One requirement that the letters fail to satisfy is that of assent to the agreement by both parties. While American Fletcher may have assented to the letters, the defendants did not do so. The letters were signed by Hargett, an assistant-vice president of First American, and Wayne Haskins, vice-president of Fidelity, the two officers who signed the December 13, 1972 loan commitment letter to Rhoden. Hargett was not authorized to waive or modify any of the terms of the Loan and Stock Purchase Agreement with Futren or to enter into an independent agreement with American Fletcher on behalf of the defendants.

Another contractual requirement that the letters fail to satisfy is that of consideration. No consideration flowed from American Fletcher to either defendant with regard to Hargett's letters. Plaintiff American Fletcher's act of closing its loan arrangements with Futren cannot be considered as legal consideration since it was already bound to close its loan agreements with Rhoden or an otherwise acceptable corporate nominee (which turned out to be Futren) by virtue of its two letters of commitment dated December 6, 1972, and approved by Futren on December 14, 1972. *See Johnson v. Hinson*, 188 Ga. 639, 4 S.E.2d 561 (1939); *Robert Chuckrow Const. Co. v. Gough*, 117 Ga.App. 140, 159 S.E.2d 469 (1968).

Finally, acceptance of plaintiff American Fletcher's claim that Hargett's letters constituted a contract between American Fletcher and the defendants would require that the Court accept as true the premise that the defendants, after carefully defining the conditions under which they would make advances to Futren in a comprehensive Loan and Stock Purchase Agreement, intended to waive these conditions and obligate themselves to make unconditional payments on demand for the benefit of American Fletcher. Such a premise is inherently unreasonable, and this unreasonableness requires the rejection of plaintiff's contention that the two Hargett letters were intended to constitute an independent contract between American Fletcher and the defendants.

■ Because plaintiff American Fletcher was neither a third-party beneficiary of the contract between Futren and the defendants nor a party itself to a contract with the defendants, the Court concludes that plaintiff has no standing to bring this ac-

tion against defendants First American and Fidelity for the recovery of damages. Accordingly, judgment must be entered for the defendants on this ground alone.

The Court also concludes, for the reasons discussed below, that even if plaintiff American Fletcher does have standing to bring this action, the defendants did not commit any breach of contract for which the plaintiff can recover damages.

## II. THE DEFENDANTS' ALLEGED CONTRACTUAL BREACHES

The plaintiff contends that the defendants committed contractual breaches in three ways. First, the plaintiff argues that the defendants unjustifiably and illegally refused to renew their loan commitment to Rhoden in December 1974, thereby breaching their Loan and Stock Purchase Agreement with the developer. Secondly, the plaintiff contends that the defendants' refusal to honor Draw Request No. 23 which Rhoden submitted to them in December 1974 also constituted a breach of the Loan and Stock Purchase Agreement. Finally, American Fletcher claims that the defendants' refusal to renew their loan commitment and their refusal to honor Draw Request No. 23 constituted a breach of the defendants' contract with the plaintiff.

The Court has concluded that there was no direct contractual relationship between plaintiff American Fletcher and the defendants, and the Court therefore concludes that the defendants did not breach any contract with the plaintiff. Since the plaintiff cannot recover damages on the basis of any direct contractual relationship with the defendants, it can collect damages only as a third-party beneficiary of the loan contract between the defendants and Futren. Recovery of damages is possible only if the defendants' refusal to renew their loan commitment and their refusal to honor Draw Request No. 23 constituted breaches of their Loan and Stock Purchase Agreement with Futren.

In order to determine whether the defendants' actions were breaches, it is first necessary to determine whether Futren's performance was in compliance with the terms and conditions of the Loan and Stock Purchase Agreement. This latter determination is necessary because the contract gave the defendants the right to decline to perform their contractual obligations in the event that Futren failed to comply with the provisions of the contract. Ga.Code.Ann. §§ 20–902, 20–903, and 20–904.

 · A. *Futren's Alleged Full Performance under the Terms and Conditions of the Loan and Stock Purchase Agreement*

Paragraph 6 of the loan contract provided in pertinent part that:

> *All improvements must be completed in good and workmanlike manner in accordance with the plans and specifications* approved by Licensees [defendants], without alteration or amendment except pursuant to change orders approved in writing by Licensees, and *must be paid for in full upon completion.* (Emphasis added)

Paragraph 15(a) of the agreement provided in pertinent part that:

> Concern [Futren] will not undertake or continue any development of the Project which in the opinion of Licensees materially injures the environment of the area or causes undue ecological changes, and Licensees shall have no obligation to make any further disbursement of loan proceeds while any such conditions exist.

Failure by Futren to comply with either of the above paragraphs was dealt with in Article VI, 6.1, of the Agreement as follows:

> 6.1  Concern hereby agrees that . . . the occurrence of any one or more of the following events . . . shall constitute an event of default: . . . (c) Failure in the due performance of any of the covenants, agreements, representations, warranties or indemnifications contained in the Agreement or in any obligation of Concern arising, directly or indirectly, under the Agreement. . . .

> From and after the time an Event of Default occurs, Licensees shall have no

obligation to advance any funds pursuant to the Agreement, regardless of whether Licensees have notified Concern of such default and regardless of whether such default is cured or continued to exist.

In addition to the rights of the defendants set forth above, each defendant had the right under Article VI, 6.1(h), to refuse advancement of any additional sums to Futren if defendants felt "insecure for any reason." Under Ga.Code Ann. § 109A–1–208, which was incorporated as a part of the insecure clause, the "party against whom the power . . . has been exercised" has the burden of proving the lack of good faith of the party exercising the power.

The Court concludes that Futren's performance was not in compliance with paragraphs 6 and 15(a) of the Loan and Stock Purchase Agreement, thereby permitting the defendants to refuse to advance funds to Futren under Article VI, 6.1, of the agreement. The facts clearly indicate that there were substantial breaches of contract plans and specifications as well as serious environmental damage at the time Futren submitted Draw Request No. 23 to the defendants for funding. Moreover, Futren itself repeatedly complained to Piedmont, the general contractor, about the numerous construction defects, and plaintiff American Fletcher terminated funding to Piedmont because of its deficient work. These actions, in and of themselves, are sufficient to estop both Futren and American Fletcher from now denying the existence of these breaches of the Loan and Stock Purchase Agreement. See *Brumbelow v. Quality Mills, Inc.,* 462 F.2d 1324 (5th Cir. 1972); *J. A. Jones Const. Co. v. Greenbriar Shopping Center,* 332 F.Supp. 1336 (N.D.Ga.1971), *aff'd,* 461 F.2d 1269 (5th Cir. 1972); *Anderson v. Mechanics Loan & Savings Co.,* 58 Ga.App. 147, 198 S.E. 87 (1938).

Furthermore, the numerous problems adversely affecting the development of the Woods entitled the defendants to feel "insecure" at the time Futren submitted Draw Request No. 23 to them. Plaintiff American Fletcher has the burden in this case of proving that the defendants acted in bad faith in deeming themselves insecure, and it has failed to meet this burden. The Court therefore concludes that the defendants had the right to refuse to advance funds to Futren under Article VI, 6.1(h), of the Loan and Stock Purchase Agreement.

Plaintiff American Fletcher concedes that the construction problems at the Woods may have been technical defaults under the terms of the loan contract between the defendants and Futren. The plaintiff contends, however, that the defendants waived these defaults and were therefore estopped from asserting these defaults as grounds for their refusal to advance funds to Futren in December 1974. For the reasons discussed below, the Court concludes that the defendants did not waive their rights under the Loan and Stock Purchase Agreement nor modify it in any respect.

B. *The Defendants' Alleged Waiver of Futren's Defaults under the Loan and Stock Purchase Agreement*

Plaintiff American Fletcher contends that Hargett, in his capacity as agent for the defendants, waived defendants' contract rights by failing to refer to the problems at the Woods as defaults during the fall of 1974, particularly during the negotiations involving the defendants, the plaintiff, and Rhoden. The plaintiff contends that Hargett also waived the defendants' rights by signing all of the draw requests, including Draw Request No. 23, during 1973 and 1974.

Article VII, 7.2, of the Loan and Stock Purchase Agreement, however, expressly provided that any type of inaction by the defendants regarding their rights would not constitute a waiver of these rights. This provision stated in pertinent part:

. . . no course of dealing by Licensees, nor any failure, omission or delay on the part of Licensees, in whole or in part, in exercising any of their rights, powers or remedies shall be deemed a waiver of any such rights, powers or rem-

edies, all of which shall remain in full force and effect so long as the Agreement remains in effect.

Therefore, the defendants were not required to notify Futren during the fall of 1974 that the construction defects at the Woods constituted defaults under the terms of the loan contract, and Hargett's failure to advise Futren and American Fletcher during the 1974 negotiations that the construction problems were defaults did not waive the defendants' rights.

Furthermore, Hargett's signature on each of the draw requests, including Draw Request No. 23, did not act as an estoppel or waiver, since it was nothing more than an acknowledgment by Hargett that the defendants' conditional loan commitment to Futren, which was subsequently incorporated in the Loan and Stock Purchase Agreement, was in full force and effect. In addition, Hargett's acknowledgment warned Futren and American Fletcher that they were not to rely upon the defendants' having reviewed each draw request or inspected the Woods condominium project.

For all of the above reasons, the defendants did not waive their rights under the Loan and Stock Purchase Agreement entered into with Futren and were not estopped from refusing to either fund Draw Request No. 23 or renew their loan commitment to Futren in December 1974. Since the defendants did not breach their loan contract with Futren in any respect, plaintiff American Fletcher cannot recover damages from the defendants on the basis of an alleged breach of contract. Accordingly, judgment must be entered for the defendants on this ground as well as the ground that the plaintiff lacked standing to bring this action against the defendants.

### APPENDIX A

STATE OF GEORGIA

COUNTY OF FULTON

#### *LOAN AND STOCK PURCHASE AGREEMENT*

THIS AGREEMENT made and entered into this 27 day of December 1972 by and among FIRST AMERICAN INVESTMENT CORPORATION ("First American"), a Georgia corporation, FIDELITY CAPITAL CORPORATION ("Fidelity"), a Georgia corporation, FUTREN OF POWERS FERRY, INC. ("Concern"), a Georgia corporation, and JAMES L. RHODEN, JR., ("Rhoden"), a resident of Atlanta, Georgia;

#### *WITNESSETH:*

In consideration of the mutual covenants, representations and warranties contained herein and in the Statement of General Conditions attached hereto as Exhibit A (Exhibit A, together with all other Exhibits hereto, being hereby incorporated herein by reference and made a part hereof), and other good and valuable consideration, the receipt and adequacy of which is hereby acknowledged, the parties hereto do hereby stipulate, warrant, represent, covenant and agree as follows:

1. *Parties and Certain Definitions.* Concern, a corporation with its principal office at 1100 Spring Street, Suite 390, Atlanta, Georgia, 30309, proposes to engage in the business of acquiring, developing and selling as a condominium project of approximately 300 units the real property described in Exhibit B hereto (the "Subject Property"). Rhoden is an officer, director and shareholder of Concern.

First American is a Small Business Investment Company with its principal offices at Suite 290, 300 Interstate North, Atlanta, Georgia 30339. Fidelity is a Small Business Investment Company with its principal offices at Suite 120, 290 Interstate North, Atlanta, Georgia, 30339. First American and Fidelity together with their respective successors and assigns are hereinafter sometimes referred to severally (and not jointly) as "Licensees." Notices, requests and other correspondence to either Licensee in connection with this transaction should be directed in care of First American. The obligations of First American and Fidelity hereunder are in any event several and not joint, and neither First American nor Fidel-

ity shall have any obligation hereunder for or by reason of any act, obligation or omission of the other.

2. *Debt Obligations.* In reliance upon the warranties and representations and subject to the terms and conditions set out in this Agreement, First American hereby agrees to lend to Concern a total of $350,000 and Fidelity hereby agrees to lend to Concern a total of $150,000. Said loans shall be evidenced by promissory notes of Concern substantially in the form attached hereto as Exhibit C, to bear interest on the outstanding principal balance of each such note at the rate therein specified and with principal and interest to be payable at the times and in the amounts therein specified.

Except as otherwise agreed among the Licensees from time to time, the initial and each subsequent disbursement hereunder of said loan amounts shall be made seven-tenths ($7/10$) by First American and three-tenths ($3/10$) by Fidelity, and Concern agrees that any prepayments of any notes evidencing its indebtedness for said loans shall not be prepaid at any time except pro rata in proportion to the respective principal balances of such notes. If either Licensee shall for any reason fail or refuse to make its portion of any one or more subsequent disbursements hereunder, then the other Licensee shall have no obligation to make its portions of such one or more disbursements.

Commencing after the sale of 188 condominium units of the Project (as hereinafter defined), the aforementioned obligation of Licensees to lend an aggregate of $500,000.00 shall be reduced by $8,333 for every condominium unit sold thereafter. If Concern elects to reduce the total obligation of Licensees to lend as provided in Paragraph 9(b) of this Agreement, then commencing after the sale of 188 condominium units of the Project, the obligation of Licensees to lend such reduced amount shall be further reduced after the sale of each succeeding units thereafter by that amount which bears the same proportion to $8,333 as the reduced total obligation bears to $500,000.

3. *Equity Obligations.* (a) In reliance upon the warranties and representations and subject to the terms and conditions set out in this Agreement, First American agrees to and does herewith purchase from Concern 117 shares of Class A Common Stock, $.10 par value, of Concern at a price of $1.00 per share, and Fidelity agrees to and does herewith purchase from Concern 50 shares of Class A Common Stock, $.10 par value, of Concern at a price of $1.00 per share. Concern agrees to and does herewith sell said shares to the respective Licensees at said price and acknowledges receipt of payment therefor.

The parties understand and agree that said purchases of Common Stock are equity investments by Licensees in Concern and are not acquired by them as security for any debt or obligation of Concern.

(b) In reliance upon the warranties and representations and subject to the terms and conditions set out in this Agreement, First American agrees to and does herewith purchase from Concern for a purchase price of $10 a Warrant to acquire from time to time through December 26, 1982, 233 shares of Class A Common Stock, $.10 par value, of Concern at a price of $1.00 per share, and Fidelity agrees to and does herewith purchase from Concern for a purchase price of $10 a Warrant to acquire from time to time through December 26, 1982, 100 shares of Class A Common Stock, no par value, of Concern at a price of $1.00 per share. Concern agrees to and does herewith sell said Warrants to the respective Licensees at said price and acknowledges receipt of payment therefor. The said Warrants shall not be exercisable unless the aggregate loans by Licensees hereunder exceed $100.

The parties understand and agree that said Warrants are being purchased by Licensees as equity investments in Concern. The parties further agree that $1.00 is the fair market value of a share of Class A Common Stock, $.10 par value, of Concern at this date, and that an interest rate at least 1% higher than that specified for the aforesaid Debt Obligations would have been charged if the Warrants were not being issued in connection herewith.

4. *Guaranties and Security.* Concern's performance of this Agreement and all the obligations of Concern undertaken as contemplated hereby shall be guaranteed and secured as follows:

(a) By a security agreement, in form satisfactory to Licensees, conveying to Licensees a first priority security interest in all of the capital stock of Concern not owned by Licensees and in all personal property, tangible or intangible, now owned or hereafter acquired by Concern, including without limitation all contract rights, accounts receivable, lease agreements and rentals thereunder. Concern will from time to time after the date hereof execute and deliver to Licensees such other and further documents as they may reasonably request to perfect their security interest.

(b) By a deed to secure debt, in form satisfactory to Licensees, conveying to Licensees the Subject Property, said deed to be subordinate only to (i) liens for taxes not yet due and (ii) loans made or to be made to Concern by American Fletcher Mortgage Company pursuant to separate loan commitments each dated December 6, 1972, copies of which have been delivered to and approved by Licensees.

(c) By the personal guaranty of Rhoden in form satisfactory to Licensees.

5. *Business and Management Plan.* (a) Rhoden covenants and agrees that he will, subject to the direction of the Board of Directors of Concern, conduct and manage the affairs of Concern and the development and the sale of the Subject Property without remuneration of any kind, direct or indirect, except as provided in subparagraph (b) hereof. Concern agrees that it will not at any time without the prior written consent of Licensees employ or otherwise deal with Rhoden or members of Rhoden's family or with any proprietorship, partnership or corporation in which he or any member of his family has any direct or indirect beneficial interest except as provided in subparagraph (b) below. Rhoden covenants and agrees that he will at all times, until all units in the Project (as hereinafter defined) have been completed and sold,

maintain a valid written sales agreement with a real estate broker approved by Licensees for the sales management of the condominium units.

(b) It is understood and agreed that Rhoden, or his assigns, will be entitled to receive, in consideration for all development services rendered Concern by Rhoden an amount equal to (i) 3% of the construction cost of all units constructed, or (ii) $267,266.00, whichever is less. It is further understood that American Fletcher Mortgage Company ("American") has agreed that an average of $7,500.00 per month may be paid from the proceeds of the acquisition and development and construction loan for the Project to be applied to the payment of such development fee. Concern and Rhoden, or his assigns, hereby agree that after ten (10) months from the date hereof, or two (2) months after model condominium units are completed, whichever occurs first, all amounts in excess of $4,500.00 per month advanced by American for such development fee shall be deposited into an interest bearing escrow account with Licensees, and that the amounts deposited in such escrow account shall be disbursed as follows: (i) $200 will be paid to Rhoden for each valid sales contract executed with respect to a condominium unit; (ii) $200 will be paid to Rhoden at the close of the sale of each condominium unit; (iii) the balance of all proceeds in the account will be paid to Rhoden, or his assigns, upon the successful completion or sale of the Project or the termination of Licensees' obligation to make any disbursements hereunder other than the initial loan. Provided, however, that the balance in such escrow account shall be retained by the Licensees for payment of any and all obligations of Concern to Licensees in the event of any default by Concern or Rhoden hereunder.

(c) Concern shall submit to Licensees for prior approval a schedule for the sale prices of and a program for financing unit sales which shall be satisfactory in form and substance to Licensees. Unit sales prices shall not be reduced below such scheduled prices without the prior written approval of Licensees. Concern agrees to promptly furnish

Licensees with a copy of each sales contract covering the sale of any condominium unit.

6. *Plan of Development.* Concern covenants and agrees that it will promptly commence development of the Subject Property as a condominium development consisting of 300 single-family residential units. Said development of the Subject Property is hereinafter sometimes referred to as the "Project."

Concern shall not commence any portion of the Project unless and until Concern has submitted to Licensees a Plan of Development with respect to such Project and shall have received Licensees' express written approval thereof, which approval Licensees may in their sole discretion withhold if they, or any of them, are of the opinion that the Plan of Development as submitted is not satisfactorily planned, economically structured or adequately financed in view of conditions then prevailing. Licensees will upon request consult with Concern from time to time concerning said Plan of Development in order to assist Concern in preparation of satisfactory plans. Such Plan of Development shall include: (i) commitments for all development, construction and permanent financing necessary for completion of the Project; (ii) final and complete plans and specifications for the Project; (iii) evidence of all governmental consents and authorizations necessary or desirable for prompt commencement and completion of the Project; (iv) all construction contracts necessary for completion of the Project; (v) projected income and expense statement for completion of the Project; and (vi) such other and further information as may be required by Licensees. Neither the aforesaid construction contracts nor any other agreement for improvement of the Subject Property shall be entered into without the prior written consent of the Licensees. Without Licensees' prior written consent, no expense shall be incurred for any item materially in excess of the anticipated cost thereof as specified in the aforesaid expense projections.

Concern agrees that no more than fifty (50) unsold condominium units will be completed or under construction at any time, without written permission of Licensees. Licensees will permit the construction of additional units in groups of approximately ten (10) units when ten (10) units, whether complete or under construction, have been sold, such sales to be evidenced by written sales contracts accompanied by a substantial earnest money deposit. Notwithstanding the above, Concern may construct twelve (12) model condominium units, which will not be considered in determining the number of units completed or under construction for purposes of this paragraph. It is understood that the acquisition loan from American to Concern shall be used for site work and the construction of recreational facilities on the Project and that such work may be commenced before commencement of construction of any condominium units.

All improvements must be completed in good and workmanlike manner in accordance with the plans and specifications approved by Licensees, without alteration or amendment except pursuant to change orders approved in writing by Licensees, and must be paid for in full upon completion. Upon such completion of the Project, Concern will furnish to Licensees an architect's or approved engineer's final certificate of compliance with said plans and specifications or, alternatively, shall furnish to Licensees evidence of governmental inspection satisfactory to Licensees.

7. *Development Schedule.* In addition to any other event of default specified in this Agreement or in any document delivered or to be delivered pursuant hereto, this Agreement and any obligation of Concern or Rhoden delivered or to be delivered pursuant hereto (including, but not by way of limitation, all Debt Obligations of Concern to Licensees) shall be in default for all purposes if Concern has not prior to the first anniversary of the date hereof commenced development and improvement of the Subject Property.

8. *Application of Loan Proceeds.* (a) All of the loan proceeds disbursed and to be disbursed by Licensees to Concern as provided in Paragraph 2 hereof shall be applied by Concern for expenditures related to the Project which are deemed necessary or desirable by the Board of Directors of Concern and are approved in writing by Licensees.

(b) All net proceeds of all development, construction loans for the Project shall be applied by Concern for the following purposes: (i) the cost of acquiring the Subject Property; (ii) costs of material and direct labor for the Project; and (iii) other expenditures related to the Project which are deemed necessary or desirable by the Board of Directors of Concern and are approved in writing by Licensees.

9. *Disbursement Schedule.* An initial disbursement of $100.00 of loan proceeds is made hereunder by Licensees as of the date hereof, and receipt thereof is hereby acknowledged by Concern. Further disbursements of loan proceeds pursuant to Paragraph 2 hereof shall be made from time to time not more frequently than monthly, for the purposes described in Paragraph 8(a) hereof, upon application by Concern and inspection and investigation by Licensees as hereinafter specified, as and to the extent that the expenses incurred and then payable by Concern for the aforesaid purposes exceed the cash otherwise available to Concern for payment of such expenses.

The aforesaid applications of Concern for further disbursements shall be in form satisfactory to Licensees, shall contain such assurances of Concern's compliance with this Agreement as Licensees may specify from time to time, and shall be accompanied by copies of bills paid or to be paid by the requested disbursement. Upon receipt of each such application Licensees may at their option inspect the Subject Property to determine whether work described in said bills, to the extent that such bills relate to improvements to the Subject Property, has been satisfactorily carried out in a good and workmanlike manner consistent with the Plan of Development described in Para-

graph 6 above. Unless the averments of the disbursement application are not substantiated to Licensees' satisfaction by any such inspection or investigation, Licensees shall disburse the requested amount to Concern not later than the tenth business day after the day said application is received.

Anything herein to the contrary notwithstanding, no disbursement of loan proceeds will be made by Licensees:

(a) In excess of the respective loan limits specified in Paragraph 2 hereof, or

(b) After December 15, 1973; provided, however, that said date will be extended for four successive periods of one year each upon written request by Concern to Licensees made prior to such date (as theretofore extended) and upon payment to each Licensee by Concern of fee equal to 2% of the amount of funds each such Licensee is obligated to lend pursuant to Paragraph 2 during any such extension period. Concern may reduce by $100,000 or even multiples thereof the aggregate amount of funds each Licensee is obligated to lend under Paragraph 2 of this Agreement during any such renewal period by specifying such reduced amount in the written notice of extension.

10. *Prepayment Requirement.* Concern covenants and agrees that all rents, loan proceeds and other revenues received by Concern and not required for acquisition of Subject Property, completion of the Project, or servicing the acquisition, development, construction and permanent loans for the Project shall be forthwith paid to the Licensees in prepayment of the Debt Obligations held by them pursuant to Paragraph 2 hereof; provided, however, this Paragraph 10 shall not in any event require that the aforesaid Debt Obligations be amortized during the first five years from the date hereof at a rate exceeding an accumulated average of 20% of principal per year. To the extent that said funds are not applied in prepayment of said Debt Obligations, such funds shall be held in escrow upon terms and conditions satisfactory to Licensees.

11. *Buy-Sell and Put-Call Agreement.* Concern, Rhoden and Licensees shall exe-

cute and deliver a Buy-Sell and Put-Call Agreement, in form satisfactory to Licensees, providing among other things for certain restrictions on the transfer of capital stock of Concern.

12. *Election of Directors.* Rhoden covenants and agrees that at any time and from time to time while any Debt or Equity Obligation of Concern is held by Licensees, Rhoden will upon request of First American or Fidelity vote all of his shares of stock in Concern towards election of one director of Concern specified by each such Licensee (for a total of two such directors) and will take appropriate action to increase the total number of directors of such corporation to the extent necessary to insure that any directors so elected do not constitute a majority of the corporation's Board of Directors.

In addition, Rhoden covenants and agrees that at any time and from time to time while Concern is in default in any of its obligations to Licensees, Rhoden will upon request of First American or Fidelity vote all of his shares of stock in Concern towards election of one or more directors of Concern so specified by First American or Fidelity. This provision gives Licensees the right to be represented by a majority of the Board of Directors of Concern for the duration of any such default, but not for a period in excess of seven years, subject to approval by the Small Business Administration pursuant to Section 107.901 of the SBA Rules and Regulations. The parties hereto consider the aforesaid plan, in conjunction with the other provisions of this Agreement to be fair and reasonable.

13. *Restriction on Development.* Concern and Rhoden individually covenant and agree that while any Debt or Equity Obligation of Concern is held by Licensees neither Concern, Rhoden or any member of Rhoden's family will, within five years of the date hereof or until 275 condominium units are sold, whichever occurs first, directly or indirectly acquire or participate in the acquisition or development of any condominium project lying within the area designated on Exhibit "D" attached hereto and incorporated herein.

14. *Commitment Fee.* In consideration of the Licensees having committed to enter this transaction, Concern has heretofore paid a commitment fee in the amount of $7,000 to First American and $3,000 to Fidelity, receipt of which is hereby acknowledged by the respective Licensees.

15. *Miscellaneous.* (a) Concern will not undertake or continue any development of the Project which in the opinion of Licensees materially injures the environment of the area or causes undue ecological changes, and Licensees shall have no obligation to make any further disbursement of loan proceeds while any such conditions exist. Licensees agree that when approval of a site plan or plan of development has been given by Licensees to Concern, that Licensees shall not withhold disbursements because of subsequent objections to matters shown on such site plan or plan of development. If Concern is enjoined from completing the Project by environmental or ecological protest, and such protest in the opinion of Licensees could not have reasonably been foreseen or prevented by Concern, then Licensees agree that Concern's obligation to make quarterly payments of interest on the indebtedness evidenced by the promissory notes mentioned in Paragraph 2 above, during the period of such stoppage of development shall be deferred, but in no event shall such payment of quarterly interest be deferred past the stated maturity date of the notes mentioned in Paragraph 2 of the Agreement.

(b) This Agreement and the notes and all other documents executed pursuant hereto are executed in the State of Georgia and are to be governed by and interpreted and enforced in accordance with the laws of such State.

16. *Modification of General Conditions.* The Statement of General Conditions attached hereto as Exhibit "A" is hereby amended and modified as follows:

(a) Paragraph 3.10 is amended by inserting the word "knowingly" immediately after the words "will not" in the first line thereof.

(b) The provisions of Paragraph 5.10 are deemed to have been met by Concern, except that Concern agrees to exercise its best efforts to obtain the agreement covering the matters set forth in Clause (iv) of said Paragraph 5.10.

(c) Paragraph 6.10(h) is hereby amended by striking the period at the end thereof and inserting the words "as such terms are defined in the Uniform Commercial Code."

(d) Paragraph 7.7 is amended by inserting the words "and Licensees' " immediately after the word "Concern's" at the end of the first line thereof.

17. *Release Provision.* Licensees will release individual condominium units from the lien of their deed to secure debt mentioned in Paragraph 4(b) above upon payment by Concern to Licensees of an amount equal to the sale price of such unit as approved by Licensees pursuant to Paragraph 5(c), less (i) the amount paid to American or its assigns for the release of its prior security instrument or instruments mentioned in Paragraph 4(b)(ii) above, and (ii) reasonable closing costs, commissions and income taxes. Provided, however, that if the release price herein provided shall exceed the balance then outstanding of Debtor's indebtedness to Licensees, the release price shall instead be paid into an interest bearing escrow account satisfactory to Licensees securing the payment of any additional loan proceeds thereafter disbursed by Licensees to Concern; if the funds in said escrow account at any time exceed the sum of (i) Concern's indebtedness to Licensees, plus (ii) Licensees commitment for additional loan disbursements to Concern, then in such event the amount of such excess shall be paid from the escrow account to Concern.

IN WITNESS WHEREOF, the individual party has hereunto set his hand and seal and the corporate parties have caused this Agreement to be executed on their behalf by their duly authorized officers and their corporate seals to be affixed, all as of the day and year first above set out.

[See following illustration.]

FIRST AMERICAN INVESTMENT CORPORATION

By: (s) Jerry J. Pezzella, Jr.

President

(CORPORATE SEAL)

ATTEST:

(s) Mary Ann McClellan

Assistant Secretary

FIDELITY CAPITAL CORPORATION

By: (s) Wayne J. Haskins

Vice President

(CORPORATE SEAL)

ATTEST:

(s) Carl I. Gable, Jr.

Assistant Secretary

FUTREN OF POWERS FERRY, INC.

By: (s) James L. Rhoden, Jr.

President

(CORPORATE SEAL)

ATTEST:

(s) Susan R. Odegard

Secretary

(s) James J. Rhoden, Jr.     (SEAL)

James L. Rhoden, Jr., individually

---

## STATEMENT OF GENERAL CONDITIONS—EXHIBIT A

The undersigned hereby expressly agree that the General Conditions be, and they are hereby, incorporated in and made a part of that certain financing agreement (the "Agreement") dated the 27 day of December 1972, by and among the following parties, relating to the provision of funds by Licensees to Concern:

FIRST AMERICAN INVESTMENT CORPORATION ("First American"), a Georgia corporation, FIDELITY CAPITAL CORPORATION ("Fidelity"), a Georgia corporation, FUTREN OF POWERS FERRY, INC. (Concern), a Georgia corporation and JAMES L. RHODEN, JR. ("Rhoden").

Terms Used. The following terms are used herein and in the Agreement:

(a) The term "investment" refers to all funds provided or agreed to be provided by Licensees to Concern under the Agreement or otherwise.

(b) The term "obligations" refers to all instruments now or hereafter issued and delivered, or executed and delivered, by Concern or any other party to the Agreement, to Licensees for and in consideration of investment by Licensees, or otherwise, and to all rights, remedies, undertakings, and duties evidenced by such instruments, which instruments without limitation shall include debt obligations and equity obligations (as defined below), stock, warrants, options, conversion

rights, stock acquired pursuant to warrants, options, or conversion rights, debentures, notes, indentures, mortgages, security deeds, security agreements, contracts, guaranties, endorsements, and any and all other instruments whatsoever issued and delivered or executed and delivered pursuant to or under Agreement.

(c) The term "debt obligations" refers to all obligations given under the Agreement by Concern or any other party to Licensees, in whole or in part as evidence of or in connection with a promise to repay money, whether or not coupled with a right or privilege in favor of Licensees to acquire any equity interest in Concern.

(d) The term "equity obligations" refers to all obligations under the Agreement or otherwise given by Concern to Licensees, in whole or in part as evidence of an equity interest in Concern or any other entity, or as evidence of the right or privilege of Licensees to acquire an equity interest in Concern or any other entity.

(e) The term "closing" refers to any time or times when Licensees make any investment in Concern under the Agreement or otherwise.

(f) The term "subsidiary" refers to both (i) any corporation in which Concern owns, directly or indirectly, capital stock representing 50% or more of the voting power or value of said corporation, and (ii) any other corporation in which Concern owns, directly or indirectly, capital stock having a book value or fair market value equal to 10% or more of either the net book value of Concern or fair market value of all of the assets of Concern.

(g) The term "wholly-owned subsidiary" refers to any subsidiary of Concern in which Concern owns directly or indirectly all of the outstanding capital stock and which has no obligation to issue any additional shares of capital stock to any person other than Concern or a wholly-owned subsidiary of Concern.

The use of the singular form herein shall include the plural, and the plural, the singular, where the context so requires.

## ARTICLE I

## REPRESENTATIONS AND WARRANTIES

Concern represents and warrants that, except as expressly provided in the Agreement to the contrary, each of the following facts shall be true and correct at the Closing and at each date thereafter on which Concern may receive any investment from Licensees:

1.1  Concern is a corporation duly organized, validly existing and in good standing under the laws of the State of its incorporation, is entitled to own or lease its properties and to carry on its business as and in the places where such properties are now owned or leased and such business is now conducted, and has complied with all Federal, State and local laws with respect to its operation and the conduct of its business.

1.2  Concern has no subsidiaries except those which may be listed in the certificate delivered by Concern pursuant to Paragraph 5.3 hereof.  Each of the statements made in Paragraph 1.1 above is also true with respect to any such subsidiary.  All of the capital stock of any subsidiary held by Concern is validly issued, fully paid and non-assessable and none of such shares was issued in violation of the preemptive rights of any shareholder of any such subsidiary.

1.3  All obligations issued or to be issued to Licensees under or pursuant to the Agreement are and will be duly and validly issued, fully paid and non-assessable, free of all liens, charges, encumbrances, claims or restrictions of any kind whatsoever, and shall not give rise to preemptive rights in any person.

1.4  All financial statements of Concern and its subsidiaries, consolidated or otherwise, delivered by Concern to Licensee have been prepared in accordance with generally accepted accounting principles applied (except as otherwise expressly noted) on a basis consistent with preceding years and present fairly the financial condition of said respective corporations as at the respective

dates indicated therein and the results of their respective operations for the periods indicated therein. There has been no change in the business, assets, liabilities, results of operations or financial condition of any of said corporations since the respective dates of said financial statements, other than changes in the ordinary course of business, none of which have been materially adverse.

1.5 There are no actions, suits, claims or proceedings pending or threatened against, by or affecting Concern or any subsidiary in any court or before any arbitrator or governmental agency, domestic or foreign, which might have an adverse effect on the assets of such corporations or on the operations of their business. Neither Concern nor any subsidiary has been charged with, or is under investigation with respect to, any charge concerning any violation of any Federal, State or other applicable law or administrative regulation in respect to its business.

1.6 No representation, warranty or covenant contained in the Agreement or in any written statement delivered to Licensees pursuant thereto or in connection with the transactions contemplated thereby contains or shall contain any untrue statement nor shall such representations, warranties and covenants omit any statement necessary in order to make any statement not misleading.

1.7 Concern has full power and authority to make, execute, deliver and perform the Agreement in accordance with its terms. The Agreement and all obligations delivered to Licensees pursuant thereto have been duly authorized and approved by proper corporate action and constitute valid and legally binding obligations of Concern enforceable in accordance with their terms. Execution, delivery and performance by Concern of the Agreement and said obligations will not violate or create any charge or encumbrance or other adverse condition under any contract or other instrument to which Concern is a party, or cause or permit any acceleration of, or default under, any such contract or instrument.

## ARTICLE II

## AFFIRMATIVE COVENANTS

Concern covenants and agrees that, except as expressly provided in the Agreement to the contrary, the following actions will be performed directly or indirectly as hereinafter specified, until such time as (i) all debt obligations have been paid, (ii) no equity obligation in the form of stock purchase rights, warrants, or options is outstanding, (iii) all other forms of equity obligation held by Licensees have been disposed of by them, and (iv) the Agreement has been fully performed by Concern and the other parties thereto.

2.1 Concern will maintain its corporate existence, rights and franchise, and comply with all Federal, State and other applicable law or administrative regulation.

2.2 Concern will keep books, records and accounts in accordance with generally accepted accounting principles and practices consistently applied.

Within 30 days after the end of each quarter of Concern's fiscal year, Concern will upon request deliver to Licensees the following financial statements of Concern and subsidiaries (presented on both a consolidated and consolidating basis if so requested): balance sheet as at the last day of such quarter, a statement of profit and loss for the quarter then ended, and a statement of the source and application of funds for said period. The president and treasurer of Concern shall certify to Licensees that such financial statements have been prepared in accordance with generally accepted accounting principles consistently applied and fairly present the financial condition of said corporations at the date indicated and for the period indicated, and shall further certify whether Concern is at such time in default in any respect under the Agreement or any obligations.

Within 90 days after the end of each fiscal year of Concern, Concern will deliver to Licensee the following financial statements of Concern and subsidiaries (presented on both a consolidated and consolidating basis if so requested): balance sheet as at

the last day of such fiscal year, a statement of profit and loss for the fiscal year then ended, and a statement of the source and application of funds for said period. Such financial statements shall be audited and certified without qualification by independent public accountants approved by Licensees, and said accountants shall further state whether in conducting said audit they obtained any knowledge of any default by Concern under the Agreement or any obligation, specifying the nature of any such default.

2.3 Concern will give Licensees not less than five days' written notice of any meeting of directors or stockholders of Concern or any subsidiary and will permit Licensees to be represented at any such meeting. Within 15 days after the date of any meeting of directors, committee of directors, or stockholders, Concern will deliver a certified copy of the minutes thereof to Licensees. Concern and subsidiaries shall allow Licensees and their authorized representatives full access during normal business hours to all of the properties, books, contracts, commitments and records of Concern and its subsidiaries and shall furnish Licensees such information concerning the affairs of Concern and its subsidiaries as Licensees may reasonably request. No inquiry made by Licensees shall affect the representations, warranties and covenants of Concern, all of which shall survive any such inquiry.

2.4 Concern will answer in proper form within ten days from receipt any requests for confirmation or other information relative to Concern from Licensees, Licensees' auditors or the Small Business Administration.

2.5 Concern will conduct its business in the ordinary course in a diligent and responsible manner, and will maintain adequate insurance against all reasonably insurable risks, including fidelity bonding as required by Licensees.

## ARTICLE III

### NEGATIVE COVENANTS

Concern covenants and agrees that, except as expressly provided in the Agreement to the contrary, and until such time as (i) all debt obligations have been paid, (ii) no equity obligation in the form of stock purchase rights, warrants, or options is outstanding, (iii) all other forms of equity obligation held by Licensees have been disposed of by them, and (iv) the Agreement has been fully performed by Concern and the other parties thereto:

3.1 Concern and its subsidiaries will not change or amend their respective charters (or articles or certificate of incorporation) or by-laws, change the general character of their business as now conducted, or engage in any type of business not reasonably related to their business as now conducted.

3.2 Concern and its subsidiaries will not liquidate or consolidate with, or be a party to a merger with any other entity, or create any subsidiary (other than a wholly-owned subsidiary, none of the capital stock of which shall at any time be held by any other person) or enter into or continue any partnership or joint venture.

3.3 Concern and its subsidiaries will not sell, convey, assign, encumber, transfer, lease or otherwise dispose of all or any substantial portion of their respective assets, or contract to do so, or create, incur, assume, or suffer to exist any lien, charge or other encumbrance upon any of its property except liens, charges or other encumbrances in existence at Closing (and reflected in the financial statements heretofore delivered to Licensees or in the certificate delivered by Concern pursuant to Paragraph 5.1 hereof) or arising in the ordinary course of business after Closing.

3.4 Concern will not declare, set aside or pay any dividend or other distribution on or in respect of its capital stock or redeem, retire, purchase or otherwise acquire for value any of its capital stock, or issue or agree to issue any additional shares of capital stock or rights, warrants or options to acquire capital stock.

3.5 Concern and its subsidiaries will not lend money to or pledge or encumber any of their assets for the benefit of, or guarantee, endorse or become a surety for the payment

or performance of, any liability or obligation of another (other than a wholly-owned subsidiary, none of the capital stock of which shall at any time be held by any other person).

3.6 Concern and its subsidiaries will not create, assume, incur or in any manner be or become liable for any indebtedness for money borrowed other than from a bank or other financial institution on a conventional loan basis.

3.7 Concern and its subsidiaries will not acquire, hold or invest in bonds, debentures, notes, evidence of indebtedness, capital stock or other securities unless (i) issued by a wholly-owned subsidiary, none of the capital stock of which shall at any time be held by any other person, or (ii) issued by any other subsidiary and acquired prior to the Closing, or (iii) issued by the United States or a bank or other financial institution.

3.8 Concern and its subsidiaries will not pay or become obligated for any remuneration or expense accounts to, or engage in any other transaction with, officers, directors, or stockholders, or members of their families, except as and to the extent theretofore expressly approved by Licensees in writing.

3.9 Concern and its subsidiaries will not, for purposes of calculating liability for any tax on or measured by income, with respect to debt obligations issued to Licensees take any deduction for "original issue discount" in excess of such "original issue discount" as may be specified in the Agreement.

3.10 Concern and its subsidiaries will not enter into any transaction or engage in any course of dealing which would violate the regulations promulgated from time to time by the Small Business Administration under the Small Business Investment Act of 1958, as amended, or which would cause Licensees to be in violation of such regulations.

## ARTICLE IV

### ADDITIONAL FINANCING PROVISIONS

Concern hereby warrants, represents, covenants and agrees, except as expressly provided in the Agreement to the contrary, as follows:

4.1 If for any reason or cause whatsoever, whether existing at the execution of the Agreement or thereafter arising, the further disbursement of funds by Licensees to Concern would violate the regulations promulgated from time to time by the Small Business Administration pursuant to the Small Business Investment Act of 1958, as amended, then Licensees shall have no further obligation to disburse funds pursuant to the Agreement. In all other respects the Agreement shall remain of full force and effect.

4.2 Licensees' obligation to provide funds pursuant to the Agreement is expressly limited to and fixed in the amounts set forth as debt and equity obligations to be issued hereunder. In no event shall either Licensee be obligated to provide to Concern any funds other than as specified in the Agreement, even though additional funds may be required by Concern.

4.3 Notwithstanding Article III hereof, Concern may obtain additional financing from a source other than a bank or other financial institution if Licensees, after being furnished with the detailed terms and provisions of the proposed financing, consent thereto in writing; provided, however, that Licensees shall in any event be entitled to provide such financing to Concern on terms not less favorable to Concern than these proposed with such other source.

4.4 Concern shall pay all fees and expenses of Licensees' legal counsel in connection with preparation of the Agreement and related documents and consummation of the transactions contemplated therein. Concern shall also pay any stamp taxes, intangibles taxes and recording and other fees payable in respect to the execution and performance of the Agreement and the issuance and appropriate recording of all obligations and agreements, including without limitation premiums on any mortgagee title insurance policies required hereunder and all intangibles taxes and recording costs

payable with respect to any deed to secure debt and any financing statement given or entered pursuant to the Agreement.

4.5 As a condition to any obligation in the Agreement to make further disbursement of funds to Concern subsequent to the Closing, Licensees may require such other and further documents, agreements and certificates as Licensees, in their sole discretion, may deem necessary for protection of their interests.

4.6 Within ten days of receipt by Concern of any affidavit from a Licensee that any obligation has been lost, stolen, destroyed, mutilated or otherwise damaged so as to affect its transferability, Concern will, without requiring independent indemnity, make and deliver to such Licensee or its designee a new obligation in lieu of such lost, stolen, destroyed, mutilated or otherwise damaged obligation.

## ARTICLE V

### CERTIFICATES AND OTHER DOCUMENTS

Concern shall deliver to Licensees at or prior to the Closing the following documents in form and substance satisfactory to Licensees and their legal counsel:

5.1 A certificate executed by the president and secretary of Concern, dated as of the Closing Date, certifying in such detail as Licensees may request:

(a) That the representations and warranties of Concern contained in the Agreement or in any certificate, schedule or other document delivered pursuant to the provisions of the Agreement or in connection with the transactions contemplated thereby are true and correct as of such date; and

(b) That Concern and its subsidiaries have complied with all agreements and conditions required by the Agreement to be performed or complied with at or prior to such date.

5.2 Unanimous resolutions of the shareholders and board of directors of Concern, certified by the Secretary of Concern:

(a) Authorizing and approving the execution of this Agreement and all documents contemplated hereby, including without limitation all debt and equity obligations of Concern herein specified; and

(b) Authorizing and approving all other necessary and proper corporate actions to enable Concern to comply with and carry out the terms hereof.

5.3 Articles of Incorporation, By-laws, and list of shareholders, and list of subsidiaries of Concern, certified by the Secretary of Concern.

5.4 Certificates of Good Standing of Concern, certified by Secretary of State of Concern's State of incorporation and of each State in which Concern is qualified to do business.

5.5 SBA Form 652–D—Assurance of Compliance and SBA Form 480—Size Status Declaration.

5.6 Copies, certified by Secretary of Concern, of all security agreements and security deeds relating to any property with respect to which Licensees are, pursuant to the Agreement, to acquire a security interest, together with certified copies of all evidences of indebtedness (and a certified statement as to any other obligations) which are or may be secured by such property.

5.7 Copies, certified by the Secretary of Concern, of all leases, options or sales agreements affecting any property with respect to which Licensees are, pursuant to the Agreement, to acquire a security interest.

5.8 A mortgagee's title insurance policy (in such amounts and issued by such insurer as may be approved by Licensees) on the American Land Title Association Standard Loan Policy, Revised Coverage—1962 Form, insuring to Licensees the deed to secure debt and related instruments received by Licensees as a lien, having the priority specified in the Agreement and subject only to such exceptions as Licensees may approve, on all real property securing any obligation of Concern to Licensees; current survey of

all real property securing any obligation of Concern to Licensees, prepared by a registered engineer (approved by Licensees) and showing all courses and distances, the location of all improvements, all easements visible or otherwise, and all encroachments; and an Owner's Affidavit (in form approved by Licensees), with respect to all real property securing any obligation of Concern to Licensees.

5.9 Copies of policies (in such amounts and with such insurers as Licensees may approve) insuring all property which is to secure any obligation of Concern to Licensees.

5.10 An agreement directly enforceable by Licensees, their successors and assigns, from holder of any prior indebtedness secured by any property which is to secure any obligation of Concern to Licensees, whereunder said holder, for itself, its heirs, executors, administrators, successors, and assigns:

(i) Stipulates the principal balance and accrued interest owing, the maturity of, and the prepayment privileges with respect to said prior debt, and specifies the rights, if any, to obtain releases of any such property as well as whether the debt or any security instrument securing said debt is in default in any respect.

(ii) Agrees to make no advances or loans to any party under any so-called "open-end" or "dragnet" provision contained in any security instrument covering property which is to secure any obligation of Concern to Licensees, other than advances to pay taxes, assessments, and insurance premium concerning said property.

(iii) Agrees to look to its security interest in or title to the property conveyed by the security instrument as security only for the stipulated principal balance of such debt (as reduced by payments thereon) accrued interest thereon, advances for taxes, assessments and insurance premiums and costs of collection, if incurred.

(iv) Agrees that in the event of any default in the payment of such debt, or under any security instrument securing the same, it will give Licensees written notice of such default, and Licensees shall have the right within 30 days after the date of such notice to: (a) cure such default, in which case said payee or holder shall reinstate the loan, or (b) pay to such holder the principal balance and accrued interest thereon, in which case such holder shall assign and deliver to Licensees, without recourse or warranty, except as to the correctness of said principal balance, all instruments evidencing and securing said debt and all collateral held by said holder with respect thereto.

5.11 Such other documents, agreements and certificates as Licensees, in their sole discretion, may deem necessary for protection of their interests.

## ARTICLE VI

### EVENTS OF DEFAULT; REMEDIES

6.1 Concern hereby agrees that, except as expressly provided in the Agreement to the contrary, the occurrence of any one or more of the following events (or any one or more events of default specified elsewhere in the Agreement or in any of the obligations) shall constitute an event of default:

(a) Failure in the payment of interest upon any debt obligation of Concern when and as the same shall become due and payable.

(b) Failure in the payment of any portion of the principal of any debt obligation of Concern when and as the same shall become due and payable, whether at maturity or at a date fixed for prepayment or by acceleration or otherwise.

(c) Failure in the due performance of any of the covenants, agreements, representations, warranties or indemnifications contained in the Agreement or in any obligation of Concern arising, directly or indirectly, under the Agreement.

(d) Failure in the due performance of any of the covenants, agreements, representations, warranties or indemnifications contained in or arising under any indenture, agreement, deed to secure debt, mortgage or other instrument evidencing

or securing other indebtedness of Concern if such other default continues for a period of time sufficient to permit the acceleration of the maturity of such indebtedness of Concern.

(e) Any statement, certificate, report, representation, or warranty, express or implied, made or furnished by or for the benefit of Concern in connection with the making, execution or performance of the Agreement or obligations thereunder, or in compliance with the provisions hereof, proves to have been false or erroneous in any material respect.

(f) Concern voluntarily suspends transaction of its business, or become insolvent or unable to pay its debts as they mature, or files a voluntary petition in bankruptcy or a voluntary petition seeking reorganization or other arrangements with creditors, or files an answer admitting the jurisdiction of the court and the material allegations of an involuntary petition filed against Concern pursuant to any Act of Congress relating to bankruptcy or any Act amendatory thereof or is adjudicated bankrupt, or makes an assignment for the benefit of creditors, or applies for or consents to the appointment of any receiver or trustee for itself or any subsidiary or of all or any substantial portion of its property or the property of any subsidiary, or makes an assignment to an agent authorized to liquidate any substantial part of its assets.

(g) An order is entered pursuant to any Act of Congress relating to bankruptcy or any Act amendatory thereof, approving an involuntary petition seeking reorganization of Concern, or any order of any Court is entered appointing any receiver or trustee of all or any substantial portion of the property of Concern, or a writ or warrant of attachment or any similar process is issued by any Court against all or any substantial portion of the property of Concern, and such order approving a petition seeking reorganization or appointing a receiver or trustee is not vacated or stayed, or such writ, warrant of attachment or any similar process is not released or bonded, within 15 days after its entry or levy.

(h) The holder of any debt obligation issued pursuant to the Agreement feels insecure for any reason whatsoever.

(i) Default under the Agreement or any of the obligations or any guaranty, security agreement, deed to secure debt, buy-sell and put-call agreement or any and all other instruments now or hereafter evidencing or securing any of the obligations, by any party (other than Licensees) to any of the same.

(j) Any substantial part of any real property conveyed to Licensee as security for any of the obligations is condemned or conveyed under threat of condemnation.

(k) Voluntary or involuntary transfer, assignment, pledges or conveyance of 5% or more of the outstanding shares of any class of capital stock of Concern by any present or future shareholder (other than Licensees) then owning beneficially 10% or more of the outstanding shares of such class or the acquisition by any person after the Closing of beneficial ownership of 10% or more of the outstanding shares of any class of capital stock of Concern.

If any Event of Default occurs, then at the option of Licensees, the debt obligations shall become and be immediately due and payable, without presentation, demand, protest, notice of protest or non-payment or other notice of dishonor, or other notice of any kind all of which are hereby expressly waived by Concern, and Licensees shall thereupon be entitled to proceed immediately by all lawful means, regardless of whether set out in the Agreement or in debt obligations, to collect or obtain payment of the entire principal balance of debt obligations, together with accrued interest thereon, costs and expenses of collection and reasonable attorneys' fees. Notwithstanding the foregoing, Licensees may, at any time after exercising the foregoing option of acceleration, withdraw such acceleration; provided that no such withdrawal shall preclude Licensees from later exercise of said option of acceleration so long as any Event of Default exists uncured. From

and after the time an Event of Default occurs, Licensees shall have no obligation to advance any funds pursuant to the Agreement, regardless of whether Licensees have notified Concern of such default and regardless of whether such default is cured or continues to exist. No advance of funds by Licensees while any default exists shall be deemed a waiver of such default. After the occurrence of an Event of Default, regardless of whether the same continues to exist or is known to Concern, Licensees shall not be obligated to release any security or collateral held by them even though the provisions of a particular security instrument might otherwise entitle Concern to a release of all or part of such security or collateral.

## ARTICLE VII

## MISCELLANEOUS PROVISIONS

The parties to the Agreement agree, except as expressly provided in the Agreement to the contrary, as follows:

7.1 All of the remedies, rights and privileges of Licensees hereunder shall inure to the benefit of and be exercisable by each Licensee individually or by any transferee of any obligation, whether a transferee by negotiation, assignment or otherwise.

7.2 All powers, rights and remedies provided in the Agreement and obligations issued thereunder are cumulative and not exclusive of any other rights, powers and remedies available to Licensees and no course of dealing by Licensees, nor any failure, omission or delay on the part of Licensees, in whole or in part, in exercising any of their rights, powers or remedies shall be deemed a waiver of any such rights, powers or remedies, all of which shall remain in full force and effect so long as the Agreement remains in effect.

7.3 All notices required hereunder shall be in writing, and shall be sufficiently given if sent by certified mail, postage prepaid, to the parties at the respective addresses set out in the Agreement, unless any such party shall have by written notice specified a different address for the purposes hereof.

7.4 The Agreement and all obligations issued thereunder shall be construed in accordance with the laws of the State of Georgia.

7.5 The Agreement may be executed in a number of counterparts, each of which shall be deemed an original, and all such counterparts shall together constitute one and the same instrument.

7.6 In the event any one or more provisions contained in the Agreement or in any obligation shall for any reason be held to be invalid, illegal or unenforceable in any respect, the same shall not affect any other provisions of the Agreement or the obligations, but the Agreement and obligations shall be construed as if such invalid or illegal or unenforceable provision had never been contained therein.

7.7 Time is of the essence with respect to Concern's performance of the Agreement and all obligations.

7.8 All covenants and agreements contained in the Agreement and any other contracts, certificates, agreements or other documents executed in connection therewith shall survive the consummation of the transactions contemplated therein.

READ AND UNDERSTOOD by the duly authorized officer(s) of Concern and other parties whose signature(s) appear below under seal.

FIRST AMERICAN INVESTMENT CORPORATION

(CORPORATE SEAL)

ATTEST:

(s) Mary Ann McClellan
      Assistant Secretary

By: (s) Jerry J. Pezzella, Jr.
                  President

FIDELITY CAPITAL CORPORATION

(CORPORATE SEAL)

ATTEST:

(s) Carl I. Gable, Jr.
      Assistant Secretary

By: (s) Wayne J. Haskins
               Vice President

FUTREN OF POWERS FERRY, INC.

(CORPORATE SEAL)

ATTEST:

(s) Susan R. Odegard
      Secretary

By: (s) James L. Rhoden, Jr.
                President

(s) James L. Rhoden, Jr.      (SEAL)
James L. Rhoden, Jr., individually

# APPENDIX B

December 27, 1972

Mr. James P. Trepinski
Senior Vice President
American Fletcher Mortgage Company, Inc.
600 American Fletcher Building
Indianapolis, Indiana 46204

Re: James L. Rhoden, Jr.
     300 Unit Condominium Project
     Powers Ferry Road
     Cobb County, Georgia

Dear Jim:

This letter will acknowledge satisfaction of those certain conditions contained in our letter of commitment dated December 13, 1972.

At this time, all numbered paragraphs in our letter of commitment have been satisfied, except as noted. Paragraph 6 concerning the annual renewal of our commitment will be assigned to American Fletcher Mortgage Company, Inc. Paragraphs 8, 9, 12, 21, and 22 shall all continue to operate through the life of the project unless otherwise satisfied prior to that date.

It is our express intent that our $500,000.00 commitment shall be available pursuant to the conditions retained in the above Paragraphs to cover developmental risk of this project. Should cost over-runs become evident or other conditions which make American Fletcher's mortgage position insecure, our funds will be available upon your request.

If further clarification is necessary, please call on me.

          Yours very truly,
          FIRST AMERICAN INVESTMENT CORPORATION

(s) W. B. Hargett
    W. B. Hargett
    Assistant Vice President