486 A.2d 1201

**Marvin H. GREENFIELD**

**v.**

**FIRST COMMERCIAL BANK.**

**No. 608, Sept. Term, 1984.**

Court of Special Appeals of Maryland.

Jan. 17, 1985.

Leonard C. Collins, Washington, D.C., for appellant.

Timothy Dugan, Rockville (G. Vann Canada, Jr. and Miles & Stockbridge, Rockville, on brief), for appellee.

Argued before GILBERT, C.J., and WILNER and ROSA-LYN B. BELL, JJ.

WILNER, Judge.

First Commercial Bank sued Marvin Greenfield in the Circuit Court for Montgomery County to collect on three promissory notes. Greenfield paid two of the notes before trial but continued to resist the bank's effort to collect the third—a note for $65,000. On December 29, 1983, a jury returned a verdict for the bank in the amount of $92,378—$65,000 principal balance, $22,378 accrued interest, and $5,000 attorneys' fees. Greenfield appeals the judgment entered on that verdict.

The dispute over the $65,000 note arose from a disagreement as to the interest rate to be applied to it. The note itself shows the rate to be "P + 3%," which a bank officer testified meant the prime rate, on a per diem basis, plus 3%. Greenfield stated that, by agreement with the bank's president, James Brockett, the rate was to be 11 ½% per annum, and that the bank fraudulently applied the higher rate of "P + 3%." That fraud, he argued, served to vitiate the note.

There was a clear conflict in the evidence on this point. A bank vice-president, Harry Scott, testified that he wrote the interest rate "P + 3%" on the printed form of the note while Greenfield was in his office, that he told Greenfield

that the rate would be "P + 3%," that there was some discussion about the rate,.and that, because Greenfield was not a preferred borrower entitled to the prime rate, the "P + 3%" rate was an appropriate one. The prime rate during that period was about 20%, and indeed the other two notes signed by Greenfield within a week or two of the $65,000 note carried a rate of 23%.

In the face of this evidence, Greenfield no doubt realized that he had an uphill battle to convince the jury that the bank president, Mr. Brockett, had agreed to a rate of 11½%—about half the rate appearing on the note. He therefore sought to show that Brockett had a good reason to agree to the lower rate. This transaction, he proffered, came about because of certain other dealings between Brockett and him, and the explanation for Brockett's agreement to the 11½% rate required the disclosure of those earlier dealings. Declaring the proffered testimony to be a "smokescreen," however, the court rejected it. Greenfield's first complaint here concerns that ruling.

The overall proffer made by Greenfield is not as precise as it could and should have been; some aspects of it, indeed, are a bit confusing. Essentially, Greenfield sought to testify that:

(1) Brockett was virtually the *alter ego* of the bank, being chairman of the board of directors, president and chief executive, and, together with his wife, the controlling stockholder.

(2) In November, 1979, Brockett, individually, sold some land in Bowie, Maryland, to a man named Walter De-Grouchy. The purported purchase price was $90,000, to be paid $30,000 in cash and $60,000 by means of a mortgage loan from Annapolis First Federal Savings and Loan Association (Annapolis First Federal). The mortgage taken by Annapolis First Federal specifically precluded secondary financing by requiring that all of the purchase money in excess of the $60,000 mortgage loan be paid in cash.

(3) In fact, the real purchase price was $100,000, with the additional $10,000 being financed by a second mortgage to Brockett. Brockett concealed all of this from Annapolis First Federal by declining to record his second mortgage and by falsely certifying that the balance of the purchase price was paid in cash.

(4) Brockett eventually recorded the $10,000 second mortgage and sold it to Greenfield for $7,500, without disclosing the delayed recordation or that the second mortgage was in contravention of the Annapolis First Federal mortgage.

(5) In the summer of 1980, Greenfield discovered both problems when Mr. DeGrouchy missed some payments on the first mortgage. After making some of those payments himself, Greenfield foreclosed on his mortgage; that alerted Annapolis First Federal to the existence of the mortgage and prompted it to accelerate the first mortgage. Greenfield then turned to Brockett, who assured him, "I will see to it that you do not get hurt."

(6) Specifically, Brockett told Greenfield to pay the Annapolis First Federal mortgage down to $65,000 (somehow, perhaps by reason of accrued interest and expenses, it was up to $68,000). The bank would then lend him $65,000 to purchase the mortgage, which he would then pledge to the bank as collateral for the loan. The loan, said Brockett, would carry the same rate as the Annapolis First Federal mortgage, which happened to be 11½%.

(7) Greenfield assumed that Brockett had communicated the terms of the loan to Scott. At the time of closing on the loan, Greenfield said, he wasn't certain of the rate on the Annapolis First Federal mortgage; he signed the note with the interest rate blank, expecting the proper rate to be filled in later, when he learned from Annapolis First Federal the rate stated in the mortgage.

To support this version of what had occurred, Greenfield also sought to show, through cross-examination of Mr. Scott, that when the bank ultimately foreclosed on the $65,000 mortgage—the one purchased from Annapolis First

Federal—it averred the interest rate on that mortgage to be "P + 3%," *i.e.,* the same rate as on the Greenfield note. He regarded this as in the nature of an inconsistent statement; in contrast to the bank's current position that the rate on the Greenfield note had no relation to the rate on the Annapolis First Federal mortgage, this showed that the bank treated the two instruments as carrying the same rate, albeit "P + 3%."

The court rejected most of the first proffer and all of the second. It allowed Greenfield to testify that Brockett had agreed to a rate of 11½%—the same as that carried on the mortgage—and that the rate was left blank when he signed the note, but it refused to permit any evidence as to the antecedent events. It also disallowed the inquiry sought through Mr. Scott about the foreclosure proceeding, which gives rise to Greenfield's second complaint.

The two issues are related. As our conclusion on the first issue is dispositive of this appeal, however, we need not consider Greenfield's other complaints.

As noted, the court rejected Greenfield's proffer about the antecedent transactions on the ground that they were irrelevant—a smokescreen. The bank argues in support of that ruling that no inference of fraud could be drawn from the proffered testimony; to the contrary, it urges, those events would suggest a desire by the bank to placate Greenfield, not to defraud him. For that reason, it contends, the proffered testimony was irrelevant and properly disallowed.

■ The bank's argument misses the point. The fraud asserted by Greenfield lay in (1) the alleged agreement by Brockett to a particular rate as part of a mechanism to extricate both Greenfield and Brockett from the difficulties flowing from Brockett's fraudulent transaction with De-Grouchy and Annapolis First Federal, (2) execution of the note with the rate left blank on the tacit understanding that the agreed rate would be inserted, and (3) the actual insertion of a much higher rate. The key to that charge, of

course, was the alleged agreement by Brockett to the lower rate. To the extent that the proffered testimony was relevant to establish that agreement, it was relevant to the charge of fraud.

The Court of Appeals established long ago that, when a transaction is challenged as being fraudulent, the trial courts must be flexible in admitting evidence bearing on that issue, in order that the true nature of the transaction can be exposed. In *Kolb v. Whitely,* 3 G. & J. 188 (1831), a trustee for the benefit of creditors sued to recover certain goods that he alleged were fraudulently transferred to the defendant, a creditor of the insolvents, at a time that the transferors knew they were insolvent. The issue was whether certain declarations of the transferors and certain entries in their books made several days before the transfer were admissible to show their intent in transferring the goods. The Court said, at 196–97:

> "It became necessary, therefore, to prove to the jury, that at the time of the transfer and delivery of the property to Kolb, the insolvents contemplated becoming insolvent debtors; and to establish that fact, the entries and declarations were offered in evidence. The rule is well settled, that where the expressions heard, constitute a part of the transaction, they are admitted to show its character, or the speaker's intention.... Hearsay is often admitted in evidence, as part of the *res gestae;* the meaning of which seems to be, that where it is necessary, in the course of a cause, to inquire into the nature of a particular act, and the intention of the person who did the act, proof of what the person said at the time of doing it, is admissible evidence for the purpose of shewing its true character."

*See also McDowell, et al. v. Goldsmith,* 6 Md. 319 (1854).

The same point was expressed thusly in *Davis v. Calvert et al.,* 5 G. & J. 269 (1833), at 303–04:

> "Fraud vitiates every thing with which it is connected.... But being usually wrapt up in mystery, if well concerted, it is generally by circumstances only, by inductions of

particulars, some of them apparently trivial, that it can be brought to light and defeated. And in a question of fraud, any fact, no matter how slight, bearing at all on the point at issue, and not wholly irrelevant, may be admitted."

Recognizing that it is not always easy to determine at any given point whether proffered evidence will turn out to be relevant, the *Davis* Court concluded that, unless the evidence clearly appears *a priori* to be irrelevant, there is generally less mischief to be done by admitting it. "In short," the Court held at 305, "no competent means of ascertaining the truth ought to be rejected; and all the surrounding facts of a transaction that can be established by competent evidence may be submitted to a jury, who are the judges of their force and effect."

■ These principles were succinctly restated in *Waters v. Dashiell*, 1 Md. 455, 474 (1852): "In questions of fraud, any fact, however slight, if at all relevant to the issue, will be admitted in evidence...." *See also Curtis v. Moore*, 20 Md. 93 (1863); *Price v. Gover*, 40 Md. 102 (1874); *Smith v. Davis*, 49 Md. 470 (1878). Even the substantive parol evidence rule does not bar such evidence when the issue is whether a written instrument was induced by false or fraudulent statements or promises. *Schmidt v. Millhauser*, 212 Md. 585, 594, 130 A.2d 572 (1957); *Rinaudo v. Bloom*, 209 Md. 1, 9, 120 A.2d 184 (1956); *Lambert v. Smith*, 235 Md. 284, 201 A.2d 491 (1964).

■ It is true, of course, that, even in a case of alleged fraud, evidence that is wholly immaterial or irrelevant is not admissible. *Blondes v. Hayes*, 29 Md.App. 663, 350 A.2d 163 (1976). Here, however, as we have said, the proffered evidence was not of that character. It went to explain what Greenfield asserted was the true nature of the transaction. Without that background information, the jury would have little reason to accept Greenfield's version of the agreement; why would a bank president agree to lend a new customer $65,000 at half the going rate? The proffered

evidence offered the jury an answer to that question. It may not have believed the answer, but Greenfield was entitled to have the jury at least consider it.

JUDGMENT REVERSED; CASE REMANDED TO CIRCUIT COURT FOR MONTGOMERY COUNTY FOR NEW TRIAL; APPELLEE TO PAY THE COSTS.