892 F.2d 1041
 NOTICE: Fourth Circuit I.O.P. 36.6 states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Fourth Circuit.
Benita SCHRIEFER; Chesapeake Bay Surety, Inc.; Baltimore
Bond, Inc., Plaintiffs-Appellants,
v.
Carroll STEWART; Delta Surety, Inc.; Dependable Insurance
Company, Inc.; Frederick Whitaker, Defendants-Appellees.
 No. 88-1038.
 United States Court of Appeals, Fourth Circuit.
 Argued: Jan. 9, 1989.
Decided: Dec. 27, 1989.
 
 Leo Howard Lubow, for appellants.
 Donnal Shannon Mixon (Hopkins, Sutter & Clark, on brief); Andrew Jay Graham (Kramon & Graham; Gordon C. Murray, on brief), for appellees.
 Before K.K. HALL, PHILLIPS and MURNAGHAN, Circuit Judges.
 C. PHILLIPS, Circuit Judge:
 
 
 1
 Benita Schriefer, Baltimore Bond, Inc., and Chesapeake Bay Security, Inc. (Schriefer) appeal the dismissal by summary judgment of their fraud, contract, and civil conspiracy claims in this diversity action against Delta Surety, Inc., Carroll Stewart, Fred Whitaker (Delta) and Dependable Insurance Company (Dependable). We conclude that genuine issues of material fact exist, making improper the grant of summary judgment with respect to the fraud and contract claims. Accordingly, we reverse and remand those claims for further proceedings. Because Schriefer failed properly to raise any issue respecting dismissal of the civil conspiracy claim, we affirm its dismissal.
 
 
 2
 * At the critical times, all parties to this action were in the bail bonding business. Dependable was licensed to underwrite bail bonds nationally. Delta was Dependable's general agent in Maryland and several other states; Stewart was Delta's president, sole shareholder, and sole director, and Whitaker was an upper level Delta employee who solicited persons to become Delta bail bond agents and then audited their performance. Schriefer was a subagent for Delta in Maryland and formed Baltimore Bond and Chesapeake Surety as agencies to operate her business.
 
 
 3
 Schriefer obtained a Maryland bail bond license in April 1983 and began to execute bail bonds pursuant to a March 1983 agency agreement with Delta (basic agreement). Under the basic agreement Schriefer was to remit to Delta two percent of the liability amounts written, and Delta, under its separate agency contract with Dependable, had to split this amount with Dependable. Delta and Dependable retained these amounts as their fees. Schriefer also was to remit to Delta an additional one percent to establish a build-up fund to protect Delta and Dependable against bail forfeitures, and she deposited $10,000 with Dependable to set up a separate reserve fund account. While Dependable was not a signatory to the basic agreement between Delta and Schriefer, it was specifically named in that agreement as having rights to enforce the agreement in the event of Delta's default.
 
 
 4
 In July 1983 Schriefer and Delta entered into a "First Addendum" to their basic agreement. In negotiations leading to the execution of this addendum agreement, Schriefer, her husband, William, and her attorney, John Wood, had met in May 1983 with Stewart and Whitaker at Delta's offices in Atlanta. At this meeting, Schriefer claims to have been orally told that she would receive upon signing:
 
 
 5
 (1) the exclusive agency rights to write bail bonds in eleven identified northern Maryland counties;
 
 
 6
 (2) a list of between 30 and 40 persons ready to act as subagents in these counties;
 
 
 7
 (3) an introduction to various sheriffs who would be able to introduce Schriefer to experienced retired law enforcement officials interested in becoming subagents;
 
 
 8
 (4) a computer (supposedly no longer needed by Delta) capable of performing Schriefer's administrative work;
 
 
 9
 (5) personal visits by Stewart and staff to Maryland to train Schriefer and Schriefer's staff;
 
 
 10
 (6) support and assistance as needed;
 
 
 11
 (7) an interstate network of agents available both to post bail for Schriefer's clients and to capture bail-jumpers.
 
 
 12
 Though the parties then agreed on a final contract price of $100,000, the final terms were not agreed upon, and the agreement was not executed until July.[1] As executed, the written agreement expressly granted an exclusive agency in eleven northern Maryland counties, but it incorporated none of the specific administrative support obligations on Delta's part that Schriefer claims were promised her at the Atlanta meeting, except as they might be implied in the following provision:
 
 
 13
 V. DUTIES OF DELTA. DELTA shall provide CHESAPEAKE all of the administrative and management assistance and expertise as may reasonably be requested and required by CHESAPEAKE to procure, qualify, train, and establish its agents and subagents in their offices throughout the Area and will provide continuing supportive services to include audit, record reviews, management and record keeping systems.
 
 
 14
 J.A. 43. After execution of the addendum agreement, Schriefer set up Chesapeake Bay Surety to operate the new territory. Difficulties between the parties soon arose. Schriefer nevertheless paid a total of $84,000 in installments on the $100,000 purchase price before ceasing payments following the payment in September 1984. In late December 1985, after discussions with Delta proved unavailing, Schriefer wrote Dependable, protesting that she had received nothing for her payments of $84,000 to Delta, and requesting Dependable to intervene. Dependable, which was not mentioned in the addendum agreement, had taken no part in the negotiations between Delta and Schriefer leading up to it, and claimed to have had no prior knowledge of its contents, declined to act as requested. Shortly thereafter, Delta requested that Dependable terminate Schriefer, on grounds of Schriefer's failure to fulfill the contractual obligations under the basic agency agreement, and Dependable complied. In January 1986, Dependable informed Maryland authorities that Schriefer and her subagents were no longer authorized to write bonds for Dependable.
 
 
 15
 In May 1986 Schriefer brought this action against Delta and Dependable claiming fraud, breach of contract, civil conspiracy, and RICO violations. The gravamen of all of the claims was that she had received nothing in return for the $84,000 paid Delta under the addendum agreement, and that Dependable was liable for the wrongful acts of its agent, Delta. Dependable then filed a cross-claim against Delta for indemnification and Delta filed a counterclaim against Schriefer for breach of contract and negligence. After discovery, Schriefer abandoned the RICO claims.
 
 
 16
 In February 1988, after review of a voluminous discovery record, the district court granted the defendants' motion for summary judgment on all remaining claims. The court essentially held that as a matter of law on the undisputed material facts of record, any oral misrepresentations made by Delta were not made with a present intent to deceive, or were not reasonably relied upon, and that Schriefer's breach of contract claims were foreclosed by Schriefer's own antecedent breaches. Because the conspiracy claim depended on the viability of Schriefer's claim of fraudulent misrepresentation, it too failed as a matter of law. Having concluded that Delta had neither defrauded Schriefer nor breached any contract obligations to her, the court did not reach the question whether Dependable might be liable to Schriefer for Delta's conduct on agency principles. Because Delta previously had agreed to drop the counterclaims against Schriefer if its motion for summary judgment were granted, the court dismissed this counterclaim without prejudice.
 
 
 17
 This appeal followed.
 
 II
 
 18
 In reviewing the grant of summary judgment, we will take the fraud, contract, and conspiracy claims against Delta in order, observing preliminarily that Maryland law dictates the choice of law applicable to these diversity claims. Klaxon Co. v. Stentor Elec. Mfg. Co., 313 U.S. 487, 496 (1941). The question of Dependable's possible liability as principal for any of Delta's conduct as agent--a question not reached by the district court--will then be separately considered.
 
 
 19
 * Fraud
 
 
 20
 Under Maryland conflicts law, a fraud claim is governed by the law of the place of injury. Hauch v. Connor, 453 A.2d 1207, 1209 (Md.1983); see also Arabian Trading & Chem. Indus. v. B.F. Goodrich, 823 F.2d 60, 62 (4th Cir.1987) (applying Maryland law). Maryland law further holds that the place of injury is the place where the injury occurred, not the place where the conduct causing the injury occurred. Hauch, 453 A.2d at 1209.
 
 
 21
 Here, while the "wrongful acts" charged to Delta took place in Atlanta, in the form of the alleged oral misrepresentations made to Schriefer and Wood by Stewart and Whitaker, the injury allegedly resulting from them took place in Maryland, where Schriefer's acts in reliance occurred. Maryland substantive law therefore controls on Schriefer's fraud claim, both on the standard of proof required to establish liability, and in defining the elements of the tort. The standard of proof for establishing actionable fraud under Maryland law is "clear and satisfactory" evidence. First Nat'l Bank v. United States Fidelity & Guar. Co., 340 A.2d 275, 283 (Md.1975). The elements of a fraudulent misrepresentation claim under Maryland law are the traditional ones: (a) a false representation, (b) made with knowledge of its falsity or reckless indifference to its truth, (c) for the purpose of defrauding another, who (d) acted upon it in reasonable reliance upon its truth, and (e) suffered damage directly resulting from the misrepresentation. Martens Chevrolet, Inc. v. Seney, 439 A.2d 534, 537 (Md.1982). See also Learning Works, Inc. v. The Learning Annex, Inc., 830 F.2d 541, 545-46 (4th Cir.1987) (applying Maryland law). And Maryland law treats as one form of "false representation" which may constitute actionable fraud "promissory representation made with an existing intention not to perform," see Bocchini v. Gorn Management Co., 515 A.2d 1179, 1189 (Md.App.1986). In such cases
 
 
 22
 The gist of the fraud ... is not the failure to perform the agreement, but the fraudulent intent of the promisor, the false representation of an existing intention to perform where such intent is in fact nonexistent, and the deception of the promisee by such false promise.
 
 
 23
 Colandrea v. Colandrea, 401 A.2d 480, 486 (Md.App.1979).
 
 
 24
 We of course apply these substantive principles, including Maryland's "clear and convincing" proof standard, see Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986), in reviewing this grant of summary judgment. The question therefore is whether on the evidence as forecast on the summary judgment record, and as construed most favorably to the plaintiffs, a properly instructed jury reasonably could find, by clear and convincing evidence, that the plaintiffs were entitled to a verdict on their claim of fraudulent misrepresentation. See id. at 255; Felty v. Graves Humphrey Co., 818 F.2d 1126, 1128 (4th Cir.1987).
 
 
 25
 The gist of Schriefer's claim, as developed on the summary judgment record, was that the Delta defendants made two misrepresentations upon which Schriefer reasonably relied to her resulting injury. The first consisted of the implicit representation in the first addendum agreement that Delta had the power to "sell" Schriefer an "exclusive agency" in designated counties in the northern part of Maryland. The second consisted of the specific oral promises of administrative support that would be provided by Delta to Schriefer if she signed the First Addendum agreement and undertook the "exclusive agency." Schriefer's contention is that both of these were material facts under Maryland law; that both were false, the first because Delta had no such power, the second because Delta had no intention at the time to perform the promises; and that she reasonably relied on both to her resulting detriment, most specifically by paying $84,000 to "get nothing."
 
 
 26
 The district court found Schriefer's claim insufficiently supported, as a matter of law, on several grounds. First, the court concluded that "[n]early all" of the alleged misrepresentations were "insufficient because they relate solely to future intentions." J.A. 1017. While the court did not specifically identify the representations it had in mind, it seems obvious that the reference was to the oral promises of various specific kinds of administrative support allegedly made to Schriefer at the Atlanta meeting. As to these, the court, while recognizing that Maryland law would treat false statements of present intention as the subject of actionable fraud "under very limited circumstances," found Schriefer's proffer of proof inadequate as a matter of law to support such a finding here. Specifically, the court held that the only evidence offered was that the promises were not kept. This is thought an insufficient showing, standing alone, under Maryland's stringent proof standard. Under the district court's analysis, this disposed of the fraud claim to the extent it was based on these oral promises.
 
 
 27
 The court then turned to the "few alleged misrepresentations that do not refer exclusively to future events," J.A. 1017, and concluded that as to these, Schriefer's proffered evidence failed as a matter of law to support a finding of "reasonable reliance" on her part, id. at 1018. Unfortunately, the court again did not identify the specific representations it had in mind by this characterization, and its ensuing discussion of the unreasonableness of Schriefer's reliance upon them leaves us in doubt on that score. On our analysis of the record, the only representation upon which Schriefer alleged detrimental reliance other than those pertaining to "future events" was the implicit representation in the first addendum agreement of Delta's present power or authorization to "sell" her an exclusive agency to write Dependable bail bonds in northern Maryland. Without addressing that representation specifically, the court found the proffered proof of reasonable reliance lacking on two grounds. First, because the evidence indicated that Schriefer's reliance in executing the addendum agreement was entirely upon its "actual provisions" rather than upon any extrinsic representations about how it would be carried out on Delta's part. J.A. 1018. Second, because if the representations were actually made and were false, Schriefer would surely soon have discovered their falsity, yet she continued to make payments for a year and made no demand for restitution for another year. J.A. 1018-19. This suggested to the court that any injury suffered did not proximately result from reliance upon any fraudulent representations by Delta, but, rather, from Schriefer's deliberate gamble for upwards of two years that the representations were true, or would be made good in due course, despite plain indications to the contrary. Id.
 
 
 28
 We of course apply the same standard in reviewing a grant of summary judgment as did the district court in considering whether to grant it. See generally 10 Wright, Miller, & Kane, Federal Practice & Procedure: Civil 2d § 2716. Doing so here, we disagree with the district court. We conclude that genuine issues of material fact exist in respect to each of the elements of the fraud claim against Delta and, accordingly, that summary judgment was improperly granted. Regrettably, to show why requires a more detailed analysis of the summary judgment record than that reflected in the district court's memorandum opinion which, because of the uncertainties we have noted, does not aid too much in focussing our review. See id. at 674-49.
 
 
 29
 The first thing to appreciate is that to withstand summary judgment on this fraud claim, Schriefer must have demonstrated the availability of evidence which, at the least, created genuine issues of material fact with respect to each of the elements of the claim. Failure as to any, of course, defeats her claim as a matter of law. Analysis therefore must extend to each of the elements to determine the matter.
 
 
 30
 (1)
 
 
 31
 We start with the first: whether Delta made a false representation of fact. Schriefer claims that two were made: the representation that Delta had the power or authority to give her an exclusive agency in the eleven Maryland counties, and that Delta intended to provide her agency several specific kinds of administrative support. There are two potential factual issues with respect to each: whether it was made and, if so, whether it was false.
 
 
 32
 It is undisputed that the representation of authority to grant some kind of exclusive agency was made; it is implicit in the addendum agreement.
 
 
 33
 Whether the several oral promises (representations of present intention) respecting administrative support were, in the end, also "made" is at least in genuine issue. Delta apparently contends either that no such promises were ever made, or that if made in preliminary negotiations, they were withdrawn or superseded by the failure to include them expressly in the executed agreement. But Schriefer has her own deposition testimony to the effect that they were made, and this testimony would be admissible under Maryland's parol evidence rule even if the later addendum agreement were considered a wholly integrated contract. See Greenfield v. First Commercial Bank, 486 A.2d 1201, 1204 (Md.App.1985) (parol evidence admissible to show written instrument induced by false or fraudulent statements or promises). Furthermore, it is at least a genuine issue of fact whether, as Schriefer contends, Par. V of the addendum agreement, "DUTIES OF DELTA," J.A. 43, was intended by the parties to carry forward, in its general language promising "all of the administrative and management assistance and expertise as may reasonably be requested, etc.," the more specific oral promises earlier made per Schriefer's testimony. That these asserted oral representations were made is therefore at least in genuine issue.
 
 
 34
 The falsity of each of these two different representations when made is also at least in genuine issue.
 
 
 35
 The falsity of the representation of power to grant an exclusive agency has to be assessed in light of two possibilities as to its intended meaning. As indicated, this representation is implicit in the addendum agreement, specifically in Pars. I and II wherein Delta first "appoints Chesapeake [Schriefer] its sole and exclusive management agency for obtaining agents ... establishing ... offices and the writing of bail bonds in ... the Area," J.A. 41 (Par. I), then promises that it "shall not ... during the existence of this Agreement sell or grant to any person the right ... to write ... bail bonds in the area...." J.A. 41 (Par. II). This may imply one of two things about the scope of Delta's granting authority, hence the scope of the exclusive agency unmistakably being granted: that Delta only had authority to bind itself by its grant of exclusive territorial rights; or that Delta had the power or authority as well to bind Dependable.
 
 
 36
 If Delta's representation was that it could grant Schriefer an exclusive agency binding not only itself but Dependable, it is indisputable on the present record that such a representation was false. In deposition testimony nowhere challenged by Delta, Dependable officials repeatedly asserted that Delta had no exclusive territorial arrangement with Dependable and therefore had no exclusive territory of Dependable's that it could grant to any subagent. J.A. 410, 414, 424, 436, 437, 438 (deposition of Hugh J. Nelson, Dependable Corporate Secretary); 475 (deposition of Stephen J. Bolinski, Dependable Vice-President). "Delta Surety does not have an exclusive arrangement with Dependable.... Dependable has the perfect right to appoint anybody it chooses and could at any time ... make direct appointments of agents or other general agents for the Maryland territory." J.A. 410 (Nelson deposition).
 
 
 37
 The question remains, however, whether this was the representation made. Schriefer contends that it was. We think that on the present record there is a genuine issue of fact on the matter. Certainly there is evidence to support such a finding. First there is the undisputed fact that although Dependable is not named in the addendum agreement, that agreement, whose terms were essentially dictated by Delta, is, by its express terms, incorporated into the basic agreement in which Dependable is identified as the "Surety" with whom Delta and Schriefer "have contracted ... to act as Agent." J.A. 41 (First Addendum); J.A. 35 (Basic Agreement). There is further deposition testimony supporting such a finding. Specifically, there is Schriefer's testimony that the idea for an exclusive agency arrangement first came from Delta representative Whitaker on his visit to Baltimore in April 1983 and that the proposal was that Dependable would put no other agents in the named counties. J.A. 102. There is Schriefer's testimony that Whitaker gave her to understand that Delta had authority to place agents in Maryland only in its capacity as general agent for Dependable, and that as such it did not need Dependable's officers present in order to negotiate with her on Dependable's behalf. J.A. 173. Finally, there is the deposition testimony of Whitaker himself that he understood, and conveyed to Schriefer, that Delta was Dependable's exclusive general agent in the state of Maryland and could do anything with the area it desired. J.A. 545, 593.
 
 
 38
 From this evidence, a jury reasonably could infer that Delta represented that it had authority to bind Dependable as well as itself to honor the grant to Schriefer of an exclusive territorial agency. As indicated, if a jury were to conclude that this was the representation made, its falsity is established on the present record.
 
 
 39
 If a jury were to conclude, however, that the representation was only of authority to bind Delta, Schriefer might yet prevail on the basis of that more narrow representation if it were proved false. Its falsity could only be established by proof that, when made, Delta either knew that such a grant was a wholly illusory one, or that it had no intention at the time to honor it. See generally Prosser & Keeton on Torts § 106 (noting variety of types and means of making actionable misrepresentations, including non-disclosure). Delta of course now contends, as it must, that the grant was of a valuable right and that it intended at the time to honor it. But we think there is deposition testimony which puts in genuine issue the falsity, in both respects, of even the more narrow representation.
 
 
 40
 First, as to the existence of practical value, there is deposition testimony of Whitaker which we think puts this in genuine issue. Discussing the significance of the protection provided by an "exclusive agency" such as that granted Schriefer, he deposed
 
 
 41
 all of our territory for our agents [is] protected. There's no such thing as unprotected territory. We feel that we're the judge of where we're going to put agents. If it's a small county in Alabama that doesn't have but three courts, we're not going to let five agents go in there.... If we feel that a certain area will only produce "x" number of bonds, we would be defeating our own purpose and our agents' to put too many agents in there where none of them could make a living.
 
 
 42
 J.A. 576. Conceding that Schriefer was the only Delta subagent who paid for protection in an exclusive territory, Whitaker could only explain this by the fact that Schriefer received a much larger territory than anyone else. J.A. 580.
 
 
 43
 A jury might of course accept that explanation as sufficiently establishing the truth of the value impliedly represented, but we are satisfied that Whitaker's testimony alone serves to put its falsity in genuine issue.
 
 
 44
 Turning to whether Delta had the present intention of honoring even so limited a grant of exclusive agency, we again find documentary and deposition testimony in the summary judgment record which puts this in genuine issue. We start by looking again to the express language of the addendum agreement by which Schriefer's exclusive agency is defined: "Delta hereby appoints Chesapeake its sole and exclusive management agency for the obtaining of agents and subagents, the establishing of offices, and the writing of bail bonds in the following counties of Maryland...." J.A. 4 (emphasis added). This clearly implies a present intention to honor Schriefer's exclusive right to write bail bonds for Delta in the grant area. The implication of such an intention is reinforced by other language in the addendum agreement: "Delta shall not at any time during the existence of this Agreement sell or grant to any person the right or authority to write or execute bail bonds in the area of this Agreement."[2] J.A. 41 (emphasis added). But in the face of this language, Delta officials' deposition testimony suggests an understanding and intention on Delta's part at odds with the stated scope of the exclusive agency. Stewart, for example, deposed that "Agents are able to write a bond anywhere they so desire [i.e., in a state in which they are licensed] or else they can ask her for a transfer of bond if she has an agent in that area." J.A. 300, 304. Whitaker, more explicitly, deposed that Schriefer's exclusive agreement extended only to opening offices, not writing bonds. According to him, if Schriefer had offices in the named counties, other agents could not have offices there but would be permitted to write bonds. "[A]ny agent can go anywhere and write a bond if he's a licensed agent in that state." J.A. 578.
 
 
 45
 Here again, a jury could conclude on the basis of this testimony that, whatever particular Delta officials may have understood about the nature of the exclusive agency granted Schriefer, Delta intended to comply with its terms as written, hence did not misrepresent its intention by approving the terms. But we conclude that the opposite inference is equally possible, and that suffices to avoid summary judgment on this particular basis.
 
 
 46
 That leaves the question whether the falsity of the oral representations in the form of promises of administrative support is in genuine issue. As indicated, that question is whether in making those oral promises Delta falsely represented a present intention to perform them. The district court, as noted, concluded that Schriefer could not establish their falsity in this respect because her only proffered proof was that the promises were not kept. We agree that under Maryland law such proof standing alone does not suffice to prove misrepresentation of present intention. See Tufts v. Poore, 147 A.2d 717, 722 (Md.1959). But here again, we think there is other deposition testimony tending to draw intention, hence falsity of representation, into genuine issue and therefore to preclude summary judgment on this basis. To start with, both Stewart and Whitaker took the position that most of the promises alleged by Schriefer were never made, or were washed out by the addendum agreement, rather than that Delta intended to perform them as made. Much of their resulting testimony then strongly supports the inference that if these promises were made and not withdrawn or abandoned, Delta could not possibly have intended to perform them as allegedly made. Specifically, both Stewart and Whitaker stated unequivocally that they had no list of potential agents to give Schriefer. J.A. 285 (Stewart); 563, 564, 566, 568 (Whitaker). If they had had such a list, they testified, they would have pursued these names themselves. J.A. 285 (Stewart); 563 (Whitaker).
 
 
 47
 Stewart also testified that he knew no sheriffs in the exclusive territory given Schriefer, J.A. 286, and therefore could not have called upon them to introduce Schriefer to retired police officers who might want to become bail agents. Schriefer attested in an affidavit that she attended a September 1983 sheriffs' convention in Maryland with Stewart and that he knew only one sheriff there. J.A. 810.
 
 
 48
 When asked about the existence of a network of Dependable agents to post bond or catch bail jumpers, Stewart testified that agents would be available to make transfer bonds but that he had not promised Schriefer anything about their help with capturing bail jumpers. J.A. 288. Responding to a similar question, Whitaker stated, "We don't have any bounty hunters." J.A. 565.
 
 
 49
 From this, we conclude that Schriefer has identified genuine issues of fact respecting both whether these oral promissory representations were made (and not withdrawn), and whether, if made, they were false in misrepresenting Delta's intention at the time to perform them.
 
 
 50
 In summary, on the first element of the fraud claim, we conclude that there are genuine issues of material fact as to whether the implicit representation of authority to grant an exclusive agency and of intention to honor it were false, and whether the oral promises of administrative support were made and, if made, were false in misrepresenting a present intention to perform them.
 
 
 51
 (2)
 
 
 52
 We can deal quickly with the next two elements of Schriefer's fraud claim: that Delta knew the representations were false, and made them with the intent to deceive Schriefer. Both obviously are inferable as facts if the representations as made were false. Because we have held that a jury might so find on the present record, so might it make the further inference on that same record. There are therefore genuine issues of material fact respecting the knowledge and scienter elements of the fraud claim which preclude summary judgment on that basis.
 
 
 53
 (3)
 
 
 54
 The final two elements, action by Schriefer in reasonable reliance on the representations, and damages proximately resulting from them, may best be considered together. As indicated, it was primarily on the basis of lack of evidentiary support for these elements that the district court gave summary judgment for Delta. With respect, we differ again with the district court's analysis of the summary judgment record. We think that on that record there are genuine issues of material fact as to whether Schriefer acted in justifiable reliance on the misrepresentation alleged, and suffered proximately resulting damage.
 
 
 55
 We begin analysis with the controlling principles of law, with emphasis on those most relevant to the reliance-damages issues specifically involved here.
 
 
 56
 A claimant must prove not only that she relied on a false representation, but that the reliance was reasonable (or justifiable), and that it directly resulted in damage to her. Martens Chevrolet, Inc., 439 A.2d at 537. As earlier indicated, the district court held that, as a matter of law on the summary judgment record, Schriefer had not in fact relied upon any oral promises by Delta officials in entering into the contract, but upon the "actual provisions" of the written contract. And the court further held that in any event the damages allegedly sustained by Schriefer were caused not by reliance on either those oral representations or any in the contract itself, but by Schriefer's continued performance under the contract after she knew or should have known that the representations upon which she based her claim, if made, were false. J.A. at 1018-19.
 
 
 57
 It is certainly the case that the lack of justification for an alleged act of reliance upon misrepresentations may draw in question the fact of reliance itself. See generally Prosser and Keeton on Torts § 108 (5th ed. 1984). And it is also the case that a claimant's conduct in asserted reliance upon misrepresentations may be "so utterly unreasonable, in the light of information available to him, that the law may properly say that his loss is his own responsibility." Id. at p. 750. On the other hand, courts generally have been more willing in recent times to find justifiable reliance on misrepresentations even when made in arms-length business transactions than in earlier times when notions of caveat emptor prevailed. Id. at 751-52. Thus it is now the general rule that misrepresentations of the kind allegedly made here may justifiably be relied upon without independent investigation, even then their falsity might be discovered with relatively little effort. Id. at 752. We assume that the Maryland courts would apply this relatively tolerant contemporary view of the justifiability of reliance on such misrepresentations. See, e.g., Savings Bank Retirement Sys. v. Clarke, 265 A.2d 921, 925 (Md.1970); accord Restatement (Second) of Torts, § 540 (1977).
 
 
 58
 Against this legal background, we think the district court could not properly conclude that Schriefer had failed to demonstrate the existence of genuine issues of fact respecting her reliance upon the alleged misrepresentation, the justifiability of that reliance, and the causal connection between reliance and the damages alleged to have resulted. Concededly, the summary judgment record contains evidence which draws the justification for such long-continued reliance, hence the cause of damage, and indeed reliance itself, strongly in doubt. Schriefer's conduct, as there revealed, is obviously open to question in all these respects. And we are mindful that summary judgment should not be denied because of issues which, though "genuine," do not pertain to "material" facts, nor which, though pertinent to "material" facts, are not "genuine," but essentially trivial. See Anderson, 477 U.S. at 252-55.
 
 
 59
 But, all that conceded, we do not believe it possible to conclude on the present record that, as a matter of law, Schriefer's conduct was "so utterly unreasonable in light of the information available to her" that she could not reasonably have relied to her detriment on the misrepresentation alleged. The reasonableness of her conduct--its justifiability as reliance--turns to some extent at least on her state of mind. While it surely is not the rule that states of mind may never be resolved on summary judgment, see Anderson, 477 U.S. at 256, we think this is not a proper case for doing so. See Johns Hopkins Univ. v. Hutton, 488 F.2d 912, 918 (4th Cir.1973) ("due diligence" in discovering fraud not properly resolved on motion for summary judgment).
 
 B
 Contract
 
 60
 Schriefer's original agency agreement with Delta explicitly provided that Georgia law would control interpretation of this contract. By its terms, the addendum agreement was explicitly incorporated into the original agency agreement. Applying Maryland choice of law rules, we respect the parties' reasonable contractual choice of law. Kronovet v. Lipchin, 415 A.2d 1096, 1104-05 (Md.1980).
 
 
 61
 Schriefer's breach of contract claim is that Delta breached in two ways: by failing to fulfill the promises contained in the addendum agreement (including the oral promises made at the Atlanta meeting, which were allegedly incorporated into this agreement), and by terminating her without good cause. The district court, in dismissing the contract claims by summary judgment, drew on the general principle of contract law, as applied in Georgia, that "plaintiffs must show as a condition precedent to their claim of breach of contract that they complied with the obligations imposed upon them by the contract," and held that, as a matter of law, Schriefer had not done so. J.A. at 1021, citing American Fletcher Mortgage Co. v. First Am. Inv. Corp., 463 F.Supp. 186, 197 (N.D.Ga.1978). Specifically, the court accepted as established fact on the summary judgment record that Schriefer had failed to make payments due under the addendum agreement, never paid the $50,000 forfeiture owed in one case, and did not fulfill her obligations to replenish the build-up fund and so exposed Delta and Dependable to substantial liability. The court concluded that failure to comply with these contractual obligations precluded Schriefer's right to recover for breach by Delta of the performance obligations allegedly imposed by the contract and also constituted good cause for her termination.
 
 
 62
 Again, regrettably, we disagree with the district court's perception that Schriefer's breach of contract claims were subject to dismissal by summary judgment. As with her fraud claim, we think that there remain genuine issues of material fact which preclude summary judgment on the present record. Specifically, we perceive genuine issues respecting the scope of the contractual obligations assumed by Delta under the contract as properly interpreted; whether Schriefer was in substantial compliance with her own obligation, and, if not, whether Delta may have waived any antecedent breaches; and whether there was in fact good cause for Schriefer's termination.
 
 
 63
 We will discuss each of these in turn.
 
 
 64
 As our decision of the fraud claim anticipated, there are genuine issues of material fact respecting whether the oral promises allegedly made to Schriefer in the Atlanta meeting were in fact made. That issue, critical to the fraud claim, is also critical to Schriefer's claim that Delta breached the contract by not performing those promises. Without anticipating the course of further proceedings any more than is necessary at this point, we note that if it were found as fact that the promises were made, there would then remain further issues as to whether they were superseded by the later written addendum agreement, or might be considered supplementary to it, or could be considered subsumed within the general language of its Par. V. See slip op. p. 13, supra. Resolving those issues would require inquiry into the parties' intentions as to whether the addendum agreement was to be considered their wholly integrated agreement, see generally Restatement (Second) of Contracts § 209 comment c, § 213, § 214, and, relatedly, whether, if so, the general provisions of Par. V were meant to include the specific earlier oral promises of administrative support. Both of these issues--of the parties' intentions respecting integration of their various undertakings in contract negotiations and the intended meaning of the obviously ambiguous provision of Par. V respecting administrative support--are issues of material fact as to which there is genuine dispute. That is to say, a properly instructed jury could find on the conflicting evidence as forecast on the summary judgment record, that Delta made these oral promises and that they were not superseded by the written addendum agreement, hence were enforceable as contractual obligations. Obviously a jury might also fail so to find, but the existence of genuine dispute suffices to hold these critical matters at issue at this point.
 
 
 65
 Also in genuine dispute are related issues respecting whether, assuming the oral promises were potentially enforceable under the contract, Schriefer may have lost her right to enforce them by earlier failing to comply with her own contractual obligations. As indicated, it was on this point that the district court essentially rested its grant of summary judgment by drawing on the fundamental principle that one in breach of its own contractual obligations may not successfully sue for breach of reciprocal obligations. The principle is of course a valid one, but we think the court failed to appreciate that there was a genuine issue respecting whether Schriefer was in antecedent breach, and to take into account the further legal principle that a party to a contract may waive antecedent breaches and thereby remain liable for its own. See, e.g., Precision Label Indus., Inc. v. Jones, 363 S.E.2d 605, 607 (Ga.App.1987).
 
 
 66
 We perceive genuine interrelated issues both as to whether Schriefer was in substantial compliance with her obligations, hence not in antecedent breach, and as to whether Delta may have waived any antecedent breach that had occurred. Because the asserted "good cause" for Delta's termination of Schriefer was the same non-performance of obligations that was asserted as an antecedent breach excusing Delta's performance, the existence of these genuine issues of fact precludes summary judgment as to either of Schriefer's claims of breach. We summarize the outstanding issues as we perceive them on the record.
 
 
 67
 The non-performance charged to Schriefer by Delta both as excuse for its own non-performance and as good cause for its ultimate termination of Schriefer related essentially to her record of bond forfeitures, bad checks, and failure to maintain the "build-up" fund required to protect Delta and Dependable against excessive forfeitures. But despite undisputed evidence of difficulty in these respects, there is also conflicting evidence as to both (1) the extent of Schriefer's actual non-performance and Delta's resulting financial jeopardy, and (2) the extent to which Delta treated Schriefer's performance as putting her in breach. As to the latter point, we start with the indisputable fact that though Schriefer's performance under the contract extended over a two-year period, Delta never asserted any right to rescind or to cease its own performance because of Schriefer's conduct until after Schriefer complained to Dependable. Specifically, Schriefer presented evidence that she was terminated only after she wrote Bolinski, a Dependable official, seeking help in getting her $84,000 back from Delta, J.A. 847-51, and that her termination quite shortly thereafter by Dependable was at Delta's specific request. J.A. 498, 499, 514-15, 884-85. As to the actual extent of Schriefer's non-performance or non-compliance with her contractual obligations, the evidence is in substantial conflict. Although it was Delta's litigation position that Schriefer's non-compliance was substantial and justified both its own non-performance of any obligations owed and its ultimate termination of Schriefer, the deposition testimony of its own officials on this point was ambiguous to the point of outright conflict in some significant details, and was also at odds with that of Dependable's vice-president Bolinski. Specifically, with respect to one $50,000 bond forfeiture, the "Fabian transaction" which Delta heavily relied upon, Delta president Stewart deposed that it did not affect his desire to continue with the exclusive agency arrangement with Schriefer. J.A. 302-03. Stewart also deposed that the level in Schriefer's build-up had no direct effect on her termination; it was rather that she was not replacing amounts expended from the build-up fund to pay for forfeitures. J.A. 310. At one point, Stewart deposed specifically that Schriefer was terminated for failure to replace money paid for one $10,000 forfeiture, J.A. 307, while Dependable vice-president Bolinski deposed that he would only be concerned where outstanding liability not only was not being reduced but had become stagnant, and that that point had not yet arrived with Schriefer. J.A. 471. And it is undisputed that with full knowledge of all of the derelictions now charged to Schriefer, Delta continued until Schriefer's termination to demand payment on the balance owing on the $100,000 purchase price rather than seeking to rescind. Finally, the record discloses a substantial issue as to just exactly how Schriefer's account with Delta actually stood at the time of her termination. Schriefer claims that despite conceded difficulties on her part, in the end she had a small positive balance in her build-up fund. The evidence on this question is confused, owing in part to the indisputable fact that on two separate occasions accounting errors, later conceded by Delta and Dependable, understated Schriefer's account balance by amounts in the range of $10,000. Certainly there is a genuine issue as to this obviously material fact of the extent of Schriefer's defalcation under the agency contract.
 
 
 68
 In the end, our perception of the record on these interrelated issues is as follows.
 
 
 69
 It is indisputable that Schriefer issued a number of bad checks to Delta and Dependable which were returned for insufficient funds. It is indisputable that Schriefer and her companies generated considerable bond forfeitures during their three years under Delta and Dependable (over $255,000). What remains in genuine issue, however, is the actual amount of shortfall on the checks and whether the total bond forfeiture is an accurate indicia of exposure because the courts remitted a number of these forfeitures. Also in issue is whether Schriefer's build-up funds were sufficient to pay for existing or threatened forfeitures, whether her forfeiture amount was abnormal for bail bond agencies given the precarious nature of the work, and whether the forfeitures were a pretext for getting rid of Schriefer because she was starting to complain about not having received the services allegedly required under the addendum agreement.
 
 
 70
 From all this, we conclude that there are genuine issues of fact as to the scope of Delta's contractual obligations to Schriefer; whether Schriefer was in antecedent breach of the contract; whether, if so, Delta waived any such breach as an excuse for non-performance of its contractual obligations; and whether Schriefer's conduct constituted good cause for her termination. The district court therefore erred in granting summary judgment for Delta on Schriefer's breach of contract claim.
 
 C
 Civil Conspiracy
 
 71
 The district court rightly perceived that the civil conspiracy claim could not succeed if the fraud claim failed, and on that sole basis dismissed the civil conspiracy claim. While Schriefer obviously might have raised on this appeal the issue whether the court erred in so dismissing this claim, she did not do so. Fed.R.App.P. 28(a)(2) plainly requires that the appellant's brief contain "a statement of the issues presented for review." Failure to comply with this salutary rule may properly be treated as an abandonment of any issues not so stated. See, e.g., Pignons S.A. de Mechanique v. Polaroid Corp., 701 F.2d 1, 3 (1st Cir.1983). Schriefer's brief identified three issues: (in paraphrase) whether the district court erred in granting summary judgment for defendants on the fraud claim; whether the district court erred in granting summary judgment for defendants on plaintiff's contract claim; whether "Dependable is liable under general principles of agency law." Appellants' Main Brief 1-2. As Delta notes, none of these relates to the civil conspiracy claim, nor was that claim specifically addressed in the argument section of appellants' main brief. Schriefer's effort in her reply brief to suggest that the properly raised issue of the fraud claim's dismissal subsumed the civil conspiracy claim's dismissal is unavailing. The requirement of Fed.R.App.P. 28(a)(2) ordinarily may not be met by introducing an issue belatedly in a reply brief. Id.
 
 
 72
 We think no substantive injustice conceivably could result from firm adherence to the appellate rules' flat requirement here. It is inconceivable to us that any damages that might be recoverable under the civil conspiracy claim would not be almost, if not wholly, duplicative of any recovered under the fraud claim; nor that liability properly could be established under one but not the other claim on the peculiar facts of this case. The complaint, with its original aggregation of nine civil RICO claims overlying core common law fraud, contract, and civil conspiracy claims, all deriving from the same essential facts, is a typical example of the grab-bag claim pleading that increasingly afflicts the civil litigation process, and frequently, as here, tends mainly to confuse and obfuscate the critical, core issues.
 
 
 73
 We therefore consider that any issues relating specifically to the civil conspiracy claim were abandoned in the appellate process.
 
 III
 
 74
 We turn finally to the district court's grant of summary judgment in favor of Dependable. This was done, though not in express terms, simply on the basis that if, as the district court had held, Delta was not liable on the fraud and contract breach claims, Dependable could not be liable as principal--which was the sole basis of Schriefer's claim. The district court has not therefore directly addressed the question whether, without regard to Delta's liability, Dependable might be entitled to summary judgment on agency principles, beyond noting briefly that Dependable took no part in the first addendum agreement, and knew nothing of its existence for upwards of two years. J.A. at 1009, 1011.
 
 
 75
 Though we might therefore remand this question for first instance consideration by the district court, we think it appropriate to address it here in the interests of economy. The record is complete. Dependable's principal basis for seeking summary judgment was that it could not be held liable for Delta's conduct on either claim. The parties joined issue on that basis in the district court, and have briefed and argued the issue before us. We therefore think it appropriate to address the question whether Dependable is entitled to summary judgment because as a matter of law on the summary judgment record it could not be liable as principal for Delta's conduct either on the fraud or contract claim.
 
 
 76
 * There is a preliminary choice of law problem. While, as earlier noted, Schriefer's fraud claim against Delta is controlled by Maryland law, and her contract claim by Georgia law, this does not dictate the same choices of law respecting the agency principles governing Dependable's liability on either claim as Delta's alleged principal. See A. Ehrenzweig, Conflict of Laws, § 169, p. 445 (1962) (agent's authority not necessarily subject to same law as that determining legal effect of agent's conduct). The whole question of choice of law governing interstate agency relationships is somewhat murky, see E. Scoles & P. Hay, Conflict of Laws, § 18.34, 685, and the question here is further complicated by the fact that Dependable's contractual relationship with Delta is governed by Florida law, and that Maryland, whose choice of law rules we follow here, has apparently not directly addressed the issue.
 
 
 77
 The parties have not addressed this problem, and that would be reason enough for us simply to apply the law of Maryland, the forum state. We can do so with added comfort, however, because we think it most likely that this is what the Maryland courts would do.
 
 
 78
 This seems most certain with respect to the fraud claim. Given Maryland's strong emphasis on lex loci in tort law choice, see Arabian Trading, 823 F.2d at 62, we see no reason why Maryland courts would not choose the same law to govern questions of a principal's liability in tort as that governing primary liability. See Hauch, 453 A.2d at 1209 (rejecting significant contacts test for lex loci in tort).
 
 
 79
 Maryland's choice of law in respect of Dependable's liability on the contract claim is more problematic, but again we think it most likely that it would apply its own law here. While Maryland ordinarily looks to the place of contract in contract litigation, the question we confront is more directly one of principal/agent/third-party relationships than of contractual relationships, and on that we believe the Maryland courts would likely apply the choice of law rule of the Restatement.
 
 
 80
 The principal will be held bound by the agent's action if he would be bound under the local law of the state where the agent dealt with the third person, provided at least that the principal had authorized the agent to act on his behalf in that state or had led the third person reasonably to believe that the agent had such authority.
 
 
 81
 Restatement (Second) of Conflicts of Laws, § 292(2). Here, no party questions that Dependable had authorized Delta to act on its behalf in Maryland where Delta principally dealt with Schriefer in their reciprocal performances under the first addendum.
 
 
 82
 We therefore conclude that Maryland law controls on the issues of Dependable's liability as principal for Delta's conduct on both Schriefer's fraud and breach of contract claims.
 
 B
 
 83
 Turning to the substantive question, we hold that under Maryland agency principles Dependable is not entitled on the present record to summary judgment respecting its alleged liability as principal for Delta's conduct on either the fraud or breach of contract claims. Specifically, we hold that there are genuine issues of material fact on the present record which preclude holding that as a matter of law Delta had neither actual nor apparent authority to bind Dependable as its principal in respect of either the tort or contract claims.
 
 
 84
 We start with the basic legal principles that one as principal may be liable in tort to a third party for his agent's fraudulent misrepresentations, and in contract for his agent's contractual transactions, when the agent's transactional conduct is either actually or apparently authorized by the principal, or is within the agent's inherent agency power. See generally Restatement (Second) of Agency, § 257, comment a (misrepresentations); §§ 140, 145, 159 (contract). Maryland of course applies these basic principles. See, e.g., Unsatisfied Claim & Judgment Bd. v. Fortney, 285 A.2d 641, 648 (Md.1972) (actual authority); B.P. Oil Corp. v. Mabe, 370 A.2d 554, 560-61 (Md.1977) (apparent authority); Parker v. Junior Press Printing Serv., 296 A.2d 377, 381 (Md.1972) (inherent agency power of one "acting in the scope of his usual employment," treated as form of "apparent authority").
 
 
 85
 Here, the critical agency questions with respect to both the tort and contract claims turn on whether Delta had agency power or authority to bind Dependable to the legal consequences of the promises/representations allegedly made by Delta in (and possibly prior to) the first addendum agreement. As to some of Delta's alleged promises/representations, we think that actual authority existed as a matter of law. As to others, we think that genuine issues of material fact respecting Delta's apparent authority abound. Summary judgment in favor of Dependable on agency principles is therefore not proper as to either claim.
 
 
 86
 In the first place, Delta's actual authority, either express or implicit, in its "Agency Contract" with Dependable is broad indeed with respect to establishing "sub-agents" within Delta's territory. That contract defines Delta as a "General Agent" for Dependable, with authority, inter alia, to "exercise all legal means to obtain bail bond business, utilizing its established sub-agents and establishing additional sub-agents...." J.A. 65 (emphasis supplied). We hold as a matter of law that this provision conferred actual authority upon Delta to grant Schriefer contractual rights to an exclusive territory which must be honored at least by Delta itself. See Unsatisfied Claim & Judgment Bd., 285 A.2d at 648 (where authority conferred by written instrument, "nature and extent of the agent's powers are matters of law for the court"). If on remand the fact-finder were to determine that Delta promised in the first addendum to grant and honor an exclusive territorial agency to Schriefer, having no present intention to perform that promise, and then failed without justification to perform it, as a matter of law Dependable would be liable to the same extent as Delta for the legal consequences, in both tort and contract, of Delta's conduct. Obviously, partial summary judgment on this particular issue is not proper.
 
 
 87
 Turning to the oral promises/representations allegedly made by Delta, there are genuine issues of material fact respecting Delta's apparent authority (or possibly "inherent agency power") to make these which preclude partial summary judgment as to them--leaving aside any possibility of actual authority. Maryland takes an expansive view of "apparent authority," including within the concept both its traditional core and notions of "inherent agency power" and "estoppel" which, in the Restatement's formulations, are treated as discrete bases for a principal's liability to third persons in tort and contract. Compare Restatement (Second) of Agency §§ 8 (apparent authority); 8A (inherent agency powers); 8B (estoppel), with Parker, 296 A.2d at 381 (conduct within "scope of usual employment" equated with "apparent authority"), Reserve Ins. Co. v. Duckett, 214 A.2d 754, 759 (Md.1965) ("no clear line of demarcation" between estoppel and apparent authority).
 
 
 88
 The controlling Maryland agency principles for purposes of the issue we address are these fundamental ones. Apparent authority is created by acts or conduct of the principal which, reasonably interpreted, causes the third person to rely in good faith on the assumption that an agent has the principal's authority to act. Klein v. Weiss, 395 A.2d 126, 140 (Md.1978). Whether an agent's conduct or acts give rise to a justified belief of authority is a question of fact, P. Flanigan & Sons, Inc. v. Childs, 248 A.2d 473, 476 (Md.1968), and what is at issue is not apparent authority in some general sense but in the particular transaction at issue. Id. Apparent authority suffices to bind, whatever the scope of actual authority, so that "when a third party has ascertained the apparent authority with which the principal has clothed the agent, he is under no further obligation to inquire into the agent's actual authority." McClure v. E.A. Blackshear Co., 231 F.Supp. 678, 685 (D.Md.1964). From this it follows that where apparent authority exists, the principal is bound even if his agent "has, in the particular instance, exceeded or violated his instructions, and acted without authority." Parker, 296 A.2d at 381 (citation omitted).
 
 
 89
 Within these principles, it is obvious that genuine issues of material fact exist as to the scope of Delta's apparent authority in respect of the transactions at issue. The indicia of Delta's authority from Schriefer's perspective are obvious: for example, the plain identification of the general relationship between Dependable and Delta in their contract as principal and "general agent" in the writing of bail bonds; the fact that Dependable was a named party to the original agency agreement between Delta and Schriefer and was identified as an interested party, though not a signatory, in the "first addendum" drafted by Delta; the fact that it retained ultimate power to dictate Schriefer's termination. In its brief before us, Dependable relies essentially on the fact (assumed for our purposes) that it did not participate in negotiating or executing the first addendum and knew nothing about it until events began to collapse, and that Schriefer did not act reasonably in ascertaining the exact extent of Delta's actual authority. These facts, though obviously relevant to the issue of Schriefer's reasonable perception of Delta's authority, obviously are not determinative. Indeed the principal issue of Delta's apparent authority is probably the reasonableness of Schriefer's reliance on Delta's authority from Dependable. This remains a genuine issue of fact on the present record, and suffices alone to preclude summary judgment on the question of Delta's apparent authority.
 
 IV
 
 90
 Because summary judgment was not properly granted with respect to either the fraud or contract claims against either Delta or Dependable, we reverse those portions of the judgment and remand for further proceedings.[3] Because the appellants failed properly to present for review any issues respecting dismissal of the civil conspiracy claim, we deem those issues abandoned, and affirm that portion of the judgment.
 
 
 91
 AFFIRMED IN PART; VACATED IN PART; AND REMANDED.
 
 
 
 [1]
 Though it appears that Delta never "countersigned" this agreement as was contemplated, neither of the parties asserts any legal significance to this. Both treat it as formally executed
 
 
 [2]
 Deposition testimony of Dependable's officers indicates that Delta certainly had the power, under its general agency contract with Dependable to grant such an exclusive agency binding on itself, though not on Dependable. J.A. 430, 438, 441
 
 
 [3]
 Because the case is to be remanded for further proceedings on both the contract and fraud claims, we note that although these claims may proceed together to judgment, care must be taken to avoid any duplication of damages were liability established as to both. See generally Dobbs on Remedies §§ 1.5 p. 16, 9.4 p. 633. By this note we of course express no opinion on the merits of either claim